1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3                      --oOo--

4  KIMBERLY R. OLSON,            ) Case No. 21CV01482-KJM-DMC
                                 )
5           Plaintiff,           ) Redding, California
                                 )
6      vs.                       ) Tuesday,
                                 ) September 14, 2021
7  ROBERT PUCKETT,               ) 1:00 p.m.
                                 )
8           Defendant.           )
   _____)
9

10             TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE DENNIS M. COTA
11           UNITED STATES MAGISTRATE JUDGE

12
   APPEARANCES:
13
   For the Plaintiff:        KIMBERLY R. OLSON, PRO SE
14                           Post Office Box 243
                             Hornbrook, California 96044
15                           (530) 457-3669

16 For the Defendants:       J. SCOTT DONALD, ESQ.
                             Spinelli, Donald & Nott
17                           601 University Avenue
                             Suite 225
18                           Sacramento, California 95825
                             (916) 448-7888
19
   Court Recorder:           United States District Court
20                           Eastern District of California
                             2986 Bechelli Lane
21                           Redding, California 96002

22

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

ii

1   Transcriber:                    Crystal Thomas
                                    Echo Reporting, Inc.
2                                   9711 Cactus Street
                                    Suite B
3                                   Lakeside, California 92040
                                    (858) 453-7590
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

iii

1                              I N D E X

2  WITNESSES:          DIRECT    CROSS    REDIRECT    RECROSS

3  Robert Puckett SR.     17       23        --          --

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    REDDING, CALIFORNIA, TUESDAY, SEPTEMBER 14, 2021 1:00 PM

2                          --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  The Court calls the matter of Kimberly

5    Olson versus Robert Puckett, et al., Case Number 2:21-CV-

6    1482-KJM-DMC.

7            THE COURT:  Appearances for the record.  I'll take

8    the appearance on the phone first.  Ms. Olson?

9            MS. OLSON (telephonic):  Yes, your Honor.

10           THE COURT:  If you'd state your full name for the

11   record, please.

12           MS. OLSON:  Kimberly Olson, appearing in pro per.

13           THE COURT:  Very good.  And for Defense?

14           MR. DONALD:  Good afternoon, your Honor.  Scott

15   Donald for Ronald Puckett, Clint Dingman, Michelle Hanson,

16   Melissa Tulledo, and the Hornbrook Community Services

17   District.

18           THE COURT:  Counsel, I'm going to ask you to go

19   ahead and come to the podium.  I think that that will also

20   make it easier for Ms. Olson to hear on the phone.

21           Before we get to the substance of this matter, I

22   want to disclose that many years back, when I was in private

23   practice, my firm, Kodaco and Huber (phonetic), was adverse

24   in a matter to the Spinelli, Donald and Nott firm, far

25   enough back that I don't have any details other than I think

*Echo Reporting, Inc.*

2

1   it may have involved Siskiyou County.

2           Does that raise any concerns?

3           MR. DONALD:  Well, your Honor, it does because we

4   have a few other matters in front of you at this point, and

5   we represent the County in those matters.  This doesn't

6   concern the County, and it's extraordinary relief.

7           My concern is today, that since you have brought

8   that issue up, that it is a problem for our law firm.  My

9   understanding of -- of the matter is similar to yours as far

10  as the background goes.  I don't think it's appropriate to

11  go any further, and I don't intend to right now because I'm

12  not really prepared for that.

13          THE COURT:  And that's -- that's fine.  In light

14  of that, I am going to recuse -- and it has been this

15  Court's position to recuse with regard to any Siskiyou

16  matter.  So, to the extent that there's something out there

17  that hasn't yet been redirected, then that will be

18  forthcoming.  But as to this matter, if there's any

19  concerns, Counsel, then we're going to stop here before we

20  get to the substance.

21          MR. DONALD:  We don't need to stop, your Honor.

22  Thank you.  I appreciate your candor, and we can move

23  forward on this matter today.

24          THE COURT:  All right.  And you're -- if for any

25  reason you have concerns, now's the time to vent them.

*Echo Reporting, Inc.*

3

1          MR. DONALD:  Understood.

2          THE COURT:  Okay.  All right.  Then, with that,

3    let us proceed.  And I'm sorry, Counsel.  Who's with you

4    today at the counsel table.

5          MR. DONALD:  I have Robert Puckett Sr., your

6    Honor.

7          THE COURT:  Mr. Puckett, welcome.

8          MR. PUCKETT:  Thank you.

9          THE COURT:  And, Ms. Olson, you have brought this

10   matter seeking injunctive relief.  The Court has reviewed

11   the papers filed on behalf of both sides, and I want to

12   first hear from you, Ms. Olson, with regard to anything else

13   that you wish to add to the papers that have been filed or

14   anything that you wish to be heard on.

15         MS. OLSON:  Thank you, your Honor.

16         I do have a statement that I prepared for myself.

17   Due to my medications and my medical conditions, it's --

18   dealing on the phones is sometimes difficult for me, and I

19   lose my train of thought.  So I've prepared a statement.  If

20   I could go ahead and read that to you.

21         THE COURT:  You may go ahead.

22         MS. OLSON:  Okay.  Since my water was shut off on

23   July 20th, I have gotten two bills from the HCSD that do not

24   have any explanation or charges for the shutoff on them and

25   no enclosures addressing how I might get my water turned

4

1   back on.  Based on the submissions and response to the

2   Court's TRO, it seems that Defendants think that they

3   believe me to be a bad person for filing lawsuits against

4   them and then they are justified in an arbitrarily and

5   capriciously shutting off my water without any notice or

6   hearings and then just keeping it shut off forever as some

7   sort of cruel and unusual punishment.

8           When the Court issued its OSC in response to my

9   verified complaint, the motions -- the motion for TRO and my

10  supporting evidence, your Honor, specifically told the

11  Defendants to set forth in writing why my preliminary

12  injunction should not be granted.  They failed to obey that

13  order with the declarations they submitted which are just a

14  bunch of inadmissible hearsay conclusions, speculation and

15  improper arguments that have nothing to do with what they

16  did or why they did it and don't explain why there was no

17  hearing given about my water service or what the compelling

18  state interest might be in shutting off my water and keeping

19  it off.

20          The Defendants' submissions also do not explain

21  how or when I might get my water turned on besides an order

22  of the Court and so leaves completely unanswered the serious

23  questions going to the merits of the complaint and of the

24  TRO motion.

25          Right now I am living in a county with a declared

5

1   emergency for fires that has gone on for over two months,

2   and CBS has stated on the news that they expect the fire

3   season to last until November.  Every day, there is news of

4   new fires around us and smoke and ash blow over my house,

5   which is very scary anyway.  But now I have no way to fight

6   any fires with my water shut off.  So I am scared and

7   worried all the time and have trouble sleeping because I am

8   afraid I will be trapped in the house along with my -- I'm

9   sorry, your Honor.  Give me a minute.

10              THE COURT:  Take your time.

11       (Pause.)

12              THE COURT:  Ms. Olson, you still with us?

13              Madam Clerk, do we still have a connected phone

14   line?

15              THE CLERK:  As far as I can tell.

16       (Pause.)

17              THE COURT:  Ms. Olson?

18              THE CLERK:  Do you want me to try recalling her?

19              THE COURT:  Yeah, let's do.  Stand by, Counsel.

20   I'm sorry for the additional technical challenges here.

21              MR. DONALD:  Used to it.  At this point I think

22   all of us are, your Honor.

23              THE COURT:  Unfortunately.

24       (Pause.)

25              MS. OLSON:  Hello?

6

1          THE CLERK:  Hi.  Ms. Olson, are you there?

2          MS. OLSON:  Yes.  I can barely hear you again,

3 but --

4          THE COURT:  That's fine.  Are you prepared to

5 proceed, Ms. Olson?

6          MS. OLSON:  I am, your Honor.

7          THE COURT:  All right.  Go ahead.

8          MS. OLSON:  When the Klamathon -- Klamathon Fire

9 hit us in 2018, there was no response to my home from CDF or

10 our single local engine fire department, and it was my care

11 giver and neighbors who stopped the fire in my back yard

12 using the hose.

13          Personally, my medical condition means that I

14 suffer from incontinence and need to take a full shower at

15 least once a day with at least a few extra occasional quick

16 rinses and a lot of hand washing.  Not having water service

17 means I don't get to do that, and I can't do laundry or even

18 rinse out my clothes in the sink.  So, instead, I get to be

19 filthy and miserable a lot, as well as being unsanitary and

20 developing painful rashes along with other symptoms.

21          My home is always smelly now because I have to

22 conserve water and flushes of the toilet as much as I can.

23 I have had to borrow thousands of dollars to put in a

24 holding tank, pumps, and a pressure system so I can have at

25 least some potable water to delivered and available for my

7

1 use, but the cost of water delivery to my small holding tank

2 is $50 for 150 gallons of water, and deliveries are only

3 twice per week.  So I run out of water often and go a day or

4 two with nothing but a few gallon jugs for my animals to

5 drink.

6           I am also out of money.  My friends are also out

7 of money to loan me, and I have run up my credit cards

8 paying for all this stuff because the HCSD won't turn my

9 water back on no matter what I do, and they refuse to

10 respond in any way to my letters and emails about turning my

11 water service back on.  My last delivery was yesterday, and

12 I have about another day's worth of water left.

13           The Defendants have not demonstrated that an order

14 of this Court requiring them to immediately give back my

15 water meter and restore water service and forbidding them

16 from shutting it off again during the pendency of this

17 action would cause them any hardship or harm at all and did

18 not show that any public interest in being served by

19 shutting my water off and keeping it off.

20           I ask that based on the evidence submitted, the

21 Court grant those orders along with the other relief I asked

22 for about my driveway, as well as specifically ordering that

23 the Defendants stick to the normal routine of reading the

24 meter once each month between the 27th and 30th and that

25 they give me at least 48 hours' notice when they plan to do

8

1  so in order that I can make sure the driveway is clear for

2  them.

3           I would also ask that the Court order the

4  Defendants not to charge me any fees to restore my meter and

5  water service and that they be required to file a notice of

6  compliance.

7           And that's the end of my prepared statement, your

8  Honor.

9           THE COURT:  Thank you, Ms. Olson.

10          At this point, I'll hear from defense counsel.

11          MR. DONALD:  Thank you, your Honor.  I have here,

12 as I said, Mr. Puckett, who can and would testify that at

13 the time that Ms. Olson's water was shut off, she was using

14 approximately one-quarter of all of the water that was being

15 used by the 122 folks that are tied in to the water system,

16 that she was on notice of her overuse through at least three

17 notices of violation that ran from -- during a time where

18 there was an order in place requiring all 122 folks for

19 outlets -- let's call them tie-off -- tie-ins -- to limit

20 their use to 200 gallons a day, and she was using 6,000

21 gallons during that time.  All 122 were given the same

22 notice.  This was done both by posting and also on the

23 website.

24          Because of this -- and this -- just so I -- I give

25 you some timeframe, your Honor, this is about July 14th,

9

1    that the beginning of all of these events start.

2         Then there is -- because of the dire problem with

3    the Hornbrook water system, they're just not able to supply

4    enough water for everybody to use, and this is why this

5    ordinance is in place.  They have to go and read the meters

6    every day.  Of -- of the 122 people, Plaintiff's meter, Ms.

7    Olson's meter, was obstructed by her placing a -- or

8    somebody on her behalf -- placing a plank over the meter and

9    a car on top of the plant, the tires on top of the plank so

10   you can't get at it.  She was put on notice that that was a

11   violation.  Again, the notice was provided both by emailing,

12   and it was also taped to her fence, and a copy was placed

13   inside the car that was parked over the -- over the meter.

14        After several attempts over the next few days,

15   while water was going -- in the system was getting less and

16   less and less, she did not respond.  She did not cooperate.

17   The Sheriff was required to come out and tow away vehicles.

18   And at that point, she continued to utilize way too much

19   water.  And so her system, per the regulations that were in

20   place that she was absolutely aware of, required this very

21   small district to take an action that they obviously did not

22   want to do, which was to cut her water off.  The did take

23   the meter, and they did cut the water off.  And they did so

24   because you can't have one person utilizing so much water,

25   and it was pretty clear this was some purposeful act with

10

1  respect to covering her meter.

2          So, based on -- you know, and I know, your Honor,

3  we've already -- I'm trying to add to what's already been

4  before you.  So I'm not going to go through the past issues

5  that run between my clients and Ms. Olson and --

6          THE COURT:  Thank you.

7          MR. DONALD:  I'm trying to -- I'm trying to focus

8  on the issues here.  But, your Honor, Ms. Olson raises a

9  couple of issues, one, was there due process provided.

10 Absolutely there was due process, and she thumbed her nose

11 at it.  The due process was she was put on notice several

12 times of violations.  She was first warned.  She continued

13 to engage in the behavior.  She didn't stop, and the -- the

14 faucet was literally running dry.  There was no choice for

15 Hornbrook to do what they did.  That's the first issue on

16 notice.

17         Secondly, the issue of her request for relief

18 pending the outcome, the -- again, my client will testify,

19 if asked, that they just inspected the system today, and I'm

20 sure there's no surprise to your Honor, but they're running

21 at a historically low rate.  Twenty-seven gallons per hour,

22 is that what it is right now?

23         MR. PUCKETT:  Per minute.

24         MR. DONALD:  -- per minute is being generated.  So

25 the 200 gallon per day requirement for -- is -- remains in

11

1  place.  And what we're hearing is less about -- from Ms.

2  Olson is less about the practicalities of what she was

3  doing.  It's more about this issue of not being heard.

4  She's been heard, but she just hasn't responded in a way

5  that's comparable to her neighbors.

6          And, your Honor, I would submit that there are 121

7  other connections that have to be considered with whatever

8  the relief is that's provided here today.

9          THE COURT:  All right.

10          MR. DONALD:  Submitted.

11          THE COURT:  I'm sorry.  Go ahead.

12          MR. DONALD:  Submitted, your Honor.

13          THE COURT:  Before we go back to Ms. Olson,

14  Counsel, I have some -- some questions.  You've indicated

15  that the water was turned off following multiple warnings

16  and -- and notices.

17          MR. DONALD:  Yes, your Honor.

18          THE COURT:  But none of those are before the

19  Court.  Do you have them?

20          MR. DONALD:  I do, your Honor.

21          THE COURT:  All right.  Could you submit those?

22          MR. DONALD:  Yes.  I can submit those.

23          MS. OLSON:  Your Honor?

24          THE COURT:  Yes, Ms. Olson.

25          MS. OLSON:  I have to object here because I cannot

12

1  see what's being provided to the Court, and they had those

2  notices.  They should have submitted those with their

3  opposition.

4          THE COURT:  All right.  Your objection is noted,

5  and at -- at this point, Ms. Olson, the Court's going to

6  review these.  You are certainly entitled to a copy, and I'm

7  going to direct counsel to provide a copy to you.  But --

8          MR. DONALD:  Yes, your Honor.

9          MS. OLSON:  Thank you, your Honor.

10          THE COURT:  -- at this -- at this point, the Court

11  is going to receive these in the interest of securing all of

12  the facts.

13          Now, this is under a caption "Supplemental

14  Declaration of Robert Puckett."  Has this been filed,

15  Counsel?

16          MR. DONALD:  No, your Honor.  We just prepared it.

17  I didn't know if you were going to allow Mr. Puckett to --

18  to testify or not.  So I can have that in lieu of his

19  testimony or however you wish, but it has not.  We -- that

20  was prepared this morning.

21          THE COURT:  All right.  I'm going to have my clerk

22  go ahead and make some copies of this.  And is there

23  anything else besides --

24          MR. DONALD:  Your Honor, there might be one or two

25  other violations that, unfortunately, I was getting from

13

1 three or four people over the last little bit.  So I believe

2 there's at least one more violation -- notice of violation.

3 But that's the -- it's not -- it's not going to be more than

4 that.  It's going to be one or two.

5          THE COURT:  All right.  And, Ms. Olson, counsel's

6 been directed to provide you a copy of that.  What is the

7 most expeditious way to get that to you?  By email or would

8 yo prefer to have a hard copy mailed to you?

9          MS. OLSON:  An email's good, your Honor.

10          THE COURT:  All right.  And, Counsel, I'm assuming

11 you have an email address that you two have been

12 communicating at?

13          MR. DONALD:  You know, I'm not sure if we have.

14          THE COURT:  Ms. Olson, would you go ahead and

15 confirm the -- the email address, please?

16          MS. OLSON:  Yes.  It's Kimberlyrenee -- that's

17 K-I-M-B-E-R-L-Y-R-E-N-E-E -- at Yahoo.com.

18          THE COURT:  All right.

19          MR. DONALD:  When we're done here today, your

20 Honor, I'll have that right away.  I'll let my office know.

21          THE COURT:  Very good.  All right.  So the Court

22 is now advised that there was this combination of warnings

23 and written notice that -- and -- actually, let's pause

24 there for a moment.

25          My courtroom deputy has just advised that she can

14

1 and email the documents to you now, Ms. Olson, if that would

2 be helpful.

3          MS. OLSON:  Yes, your Honor.

4          THE COURT:  All right.  When my clerk gets back

5 with making copies, we'll scan and email them to you.  In

6 the meantime, without those documents in front of me,

7 Counsel, I'm going to ask for your representation as to the

8 notices.

9          Did any of them indicate that absent Ms. Olson's

10 cooperation on reducing her water usage that the result was

11 going to be removal of her water meter?

12          MR. DONALD:  My understanding is yes, your Honor.

13 And I think it might not just be the violations themselves

14 but a combination of the -- let's see here.  I believe under

15 the second violation notice it states, among other things:

16               "If the meter is obstructed again,

17               your water will be shut off per District

18               rules.  The District has the right to

19               enter the premises with the customer per

20               Government Code Section 6104."

21          That's under Exhibit F.  That would have been the

22 July 20th notice, but I believe she had that prior date and

23 that date.

24          THE COURT:  F as in Frank?

25          MR. DONALD:  F as in Frank, yes, your Honor.

15

1      THE COURT:  And it is your representation to the

2 Court that this notice was issued on or about July 20th,

3 2021?

4      MR. DONALD:  Yes, your Honor.

5      THE COURT:  All right.  The copy I have before me

6 is unsigned.

7      MR. DONALD:  Yes, your Honor.  That was,

8 unfortunately, the custom and practice of Hornbrook at the

9 time that these were being done.  These were really

10 emergency urgency orders.  They do now sign them, but they

11 didn't when -- when it was being signed (sic).

12      THE COURT:  Okay.  So long as we know --

13      MR. DONALD:  Yes.

14      THE COURT:  -- what the -- what the protocol was.

15      MR. DONALD:  Yes.  Thank you, your Honor.

16      THE COURT:  All right.  And it is your contention

17 that these were provided in various forms, hard copy as well

18 as posting at the site?

19      MR. DONALD:  Yes, your Honor, and also email.

20      THE COURT:  And email.  All right.  Was there any

21 communication from Ms. Olson in response to any of these

22 notices that you've produced?

23      MR. DONALD:  Yes.  She refused to remove -- she

24 refused to move the obstruction.  That was her response.

25      THE COURT:  All right.  Who owns the meter at the

16

1 Olson residence?

2         MR. PUCKETT:  The District owns all the meters

3 from my understanding.  It's in our policies and procedures.

4         MR. DONALD:  I understand there's a -- a question

5 on that, your Honor, and the answer is the ownership of the

6 actual meter itself that's here, this one, we don't know if

7 Ms. Olson actually bought that meter or not.  There -- the

8 meters typically are there since the District put their

9 meters in, which were the District's meters.  She contends

10 she replaced a meter, but it doesn't become her meter, and

11 that's per the rules and regulations that run through the --

12 through the District, which she's part of.  So she doesn't

13 -- she doesn't get to -- it's a little bit like fixing your

14 sidewalk.  You know, if the city decides you need to repair

15 your sidewalk because a slab is removed, it's still the

16 City's sidewalk, but you're responsible for it based on

17 statute, and it runs the same way here, your Honor.

18         THE COURT:  Counsel, can you elaborate on how the

19 water service was discontinued?  Procedurally you've

20 described the -- the notices that were provided.

21         MR. DONALD:  From a mechanical standpoint, your

22 Honor, is that what you mean?

23         THE COURT:  But mechanically, yeah, can you -- can

24 you describe for me -- I've seen reference in the documents

25 that have been filed to date with property side pipes being

17

1  -- being closed up.  Can you -- I want to hear the Defense

2  side on that.

3          MR. DONALD:  Sure.  I think that would be

4  something better coming from Mr. Puckett.  I can only tell

5  you what I know, which is they removed the meter, and they

6  capped off the pipe, which is --

7          THE COURT:  All right.  I'm prepared to -- I'm

8  prepared to hear from Mr. Puckett and allow you to do a

9  brief direct exam in that regard.  I am going to permit Ms.

10 Olson to ask questions as well.  And, for that reason, it

11 will be necessary for you to come forward, Mr. Puckett.

12         And, Madam Clerk, before you -- before you exit,

13 if you could swear the witness for me.

14         All right.  If you'd come forward, Mr. Puckett and

15 raise your right hand, the clerk of the Court is going to --

16    ROBERT PUCKETT SR. - DEFENDANTS' WITNESS - SWORN

17         THE COURT:  All right.  Mr. Puckett, if you'd have

18 a seat.  You can take off your mask.  If you'd speak

19 directly into the -- into the microphone so that Ms. Olson

20 can hear you as well.

21         Go ahead, Counsel.

22         MR. DONALD:  Thank you, your Honor.

23                     DIRECT EXAMINATION

24 BY MR. DONALD:

25 Q    Can you please state your name?

18

1  A     Robert Puckett Sr.

2  Q     Mr. Puckett, what is your involvement with the

3  Hornbrook District?

4  A     I'm the President of the Board right now.

5  Q     How long have you been involved in some way, shape, or

6  form with the District?

7  A     Off and on, probably about seven years.

8  Q     All right.  And in your role with the District, are you

9  familiar with an order that was issued limiting the amount

10  of water that was to be used on a per-person or per-

11  residence basis?

12  A     Yes.

13  Q     And what was that order?

14  A     It was put out that it was 200 gallons per household.

15  At first we were being advised to do 50 gallons per person

16  per household, but that would make it impossible to know

17  who's living -- how many people are living in the home.  So

18  we came up with the 200 gallon per household.

19           THE COURT:  And, Mr. Puckett, I'm going to pause

20  you there.  Is that 200 gallons per day?

21           THE WITNESS:  Two hundred gallons per day per

22  household.

23           THE COURT:  All right.  Go ahead, Counsel.

24           MR. DONALD:  Thank you, your Honor.  And I'm going

25  to jump ahead unless your Honor wants me to go back over

19

1 those things.

2 BY MR. DONALD:

3 Q     But based on a number of violations by Ms. Olson, tell

4 us what happened, what was the precipitating factor that led

5 to the water being turned off?  And this is Ms. Olson's

6 place.

7 A     If you read the warnings of the violation, it says that

8 you'll get a warning first, a violation second with a flow

9 restricter put in.  And then your third one, your meter

10 would be taken out.  Ms. Olson had several -- a few

11 warnings, not just for the meter but for outdoor watering

12 because outdoor watering was completely prohibited, and so

13 she got one for that, and once you read the meters, those

14 that were over the 200 gallons, we would go back and read

15 them again because we tried to get everybody to conform.

16 There was warnings put out, and then they got a -- and I

17 believe Ms. Olson got an extra warning -- or an extra

18 violation or two that we didn't do -- but the fact that we

19 had to have the Sheriff out there two times to tow vehicles

20 off because they parked on there purposefully, that's what

21 they did.  And when they come out the second time and we got

22 Ms. Olson's car or her person that takes care of her, Peter

23 Harold, had the car taken away then, at that point we were

24 going to pull the meter.  So we did.

25 Q     Okay.  So explain to us what's the process of pulling

20

1 the meter.

2 A    Well, you got the pipe coming from our water pipe and

3 the pipe going to their house, and it's got fittings on it,

4 and it's set just right where the meter will sit down in

5 there, and it's kind of like a union, and it screws on

6 there, and that's what holds it in there.  On each side, the

7 fittings that are on the pipes have shutoff valves, and they

8 have eyes on them.  So like if you shut them off, you could

9 put a lock in there to keep them from opening.

10 Q    Okay.

11 A    So the -- took the -- took her meter out and put caps

12 on there and locks on there.

13 Q    From a standpoint of understanding this is a meter,

14 it's in the ground, is that right?

15 A    Yes.

16 Q    Where was it located with respect to Ms. Olson's house?

17 A    It's on the outside of the fence, on the roadside

18 there, and I believe that belongs to the County even though,

19 like you said earlier, it's your sidewalk, but you got to

20 take care of it.  And it sits there, as with everybody's.

21 Almost all of them are outside the gate.  There are a few

22 that's inside their yards.  But, according to our policies

23 and procedures, we have the authority to go in there to read

24 that meter.  And so it's -- it was out there.  I mean,

25 they --

21

1           MR. DONALD:  I think you've answered my question.

2           THE WITNESS:  Yeah.

3           MR. DONALD:  Your Honor, I don't have any further

4   questions myself.

5           THE COURT:  All right.  Mr. Puckett, before you

6   step down, with regard to removal of the meter, you

7   described a process that included capping the pipe on -- on

8   both sides presumably, on the side that comes from your

9   facilities onto the property.  Then there's the meter which

10  has now been removed and then a cap on the pipe that goes

11  onto the Olson residence.  Is that correct?

12          THE WITNESS:  That's what I understand.  I haven't

13  actually seen the caps, but I do know there's locks on both

14  sides.

15          THE COURT:  All right.

16          THE WITNESS:  And if -- if we're going to put caps

17  on there, that's to keep -- keep them from getting debris

18  and dirt and keep them from getting contaminated.

19          THE COURT:  Is it your understanding, Mr. Puckett,

20  that any other obstructions or closures were implemented in

21  the area between the former location of meter and Ms.

22  Olson's residence?  Was there any other --

23          MS. OLSON:  I can't hear, your Honor.

24          THE COURT:  Was there any other manipulation of

25  the pipes between the meter site and the residence?

22

1        THE WITNESS:  No, other than somebody went out
2 there and put cat litter in there, and he had to clean that
3 out.  So we make it a practice when we do this to go check
4 to make sure that people don't rehook up -- they cut the
5 locks and they hook up to it or might have a meter stored
6 here and there, and we have a few places that we've done
7 that.  We have one house that we actually had to pour cement
8 in there to keep them from doing it, and we made a police
9 report and everything.
10        THE COURT:  All right.  I'm going to stop you
11 there.
12        THE WITNESS:  Okay.
13        THE COURT:  What is the current status of the
14 pipes going to the Olson residence?
15        THE WITNESS:  I guess it's still locked out.
16        THE COURT:  Okay.  Has another meter been placed
17 or is it literally just a gap between pipes from the street
18 to pipes into the house?
19        THE WITNESS:  There is just a gap there.
20        THE COURT:  Okay.  All right.  Ms. Olson?
21        MS. OLSON:  Yes, your Honor.
22        THE COURT:  This -- this is your opportunity to
23 ask Mr. Puckett questions.
24        MS. OLSON:  Okay.  First of all, your Honor, I
25 have to object to some of the statements that Mr. Puckett

23

1  said, especially when he's saying that I purposefully did

2  something.  He has no idea what's going on in my head.  And

3  also I object to him subjecting that the County owns my

4  property, which they do not.  So I'm going to just place

5  those objections on the record before I start in with Mr.

6  Puckett.

7           THE COURT:  So noted.

8           MS. OLSON:  Okay.  Thank you, your Honor.

9                      CROSS EXAMINATION

10 BY MS. OLSON:

11 Q    Mr. Puckett, what was the date that you pulled my

12 meter?

13 A    I couldn't tell you right offhand.

14 Q    You don't know when it was pulled?

15 A    Not the exact date.  I'd have to look and see.

16 Q    Well, do you have anything with you that can tell you?

17           THE COURT:  Is -- is there a dispute in this

18 regard?

19           MR. DONALD:  No.

20           THE COURT:  All right.  What was the date,

21 Counsel?

22           MR. DONALD:  I believe it's actually in her own

23 papers.

24           MS. OLSON:  Was it the 20th?  Because that was the

25 day I discovered -- or somebody discovered for me that the

24

1 meter was gone, and I don't know whether it was actually

2 pulled before then or what.

3          MR. DONALD:  July -- July 23rd, your Honor, is my

4 understanding.

5          THE COURT:  Counsel has represented that it was on

6 or about July 23rd.

7          MS. OLSON:  Well, when my care giver went out

8 there on the 20th, it was gone.

9          THE COURT:  All right.  So noted.

10          MS. OLSON:  So I know it was gone on that date

11 specifically.

12          THE COURT:  Okay.  Go ahead, Ms. Olson.

13          MS. OLSON:  Okay.

14 BY MS. OLSON:

15 Q    Mr. Puckett, were you aware that during the middle of

16 July there was absolutely no water on this block available

17 due to the leak that you later found in the system that was

18 blowing like, what was it, 27 gallons a minute?  What did

19 you say on TV?

20 A    I don't recall saying any amount on television when

21 they interviewed me.

22 Q    Well, what did you say about that leak?  How much water

23 was going?  Was it affecting the system?

24 A    Yeah, I'm sure it was, and I think I brought that out,

25 and then I also brought the fact out there was a few

25

1  customers that were using way too much water.  No names
2  mentioned.
3  Q    Mr. Puckett, were you informed by residents on my block
4  that there was no water to be had during this time?
5  A    We had -- I went to your neighbor across the street
6  there, the ones with the rock fence.
7  Q    Right.
8  A    And when I took a five-gallon jug of water over there
9  that we were distributing, I went in there, and the lady was
10 telling me that they were getting very little water.  It was
11 enough to fill their toilets.  Up a little further and a
12 little higher where I was, we never had no water for 14
13 days.  We didn't even have water filling our toilets.  Down
14 at your street, everybody was getting a little water.  And
15 on the other side of town where it's a little lower, they
16 were actually even getting a little more.
17 Q    So, despite being told that there wasn't water coming
18 out of the pipes and that -- the fact that you -- you
19 personally knew that there was a well put in for watering
20 the properties over there?  You guys knew that there was a
21 well put in.  You were informed that there was a well put
22 in, but you didn't care about that, that we were using that
23 to water the yard, because we didn't have any water.
24         MS. OLSON:  Ms. -- Ms. Olson, are you contending
25 that separate and apart from the District's water supply you

26

1 dug a well?

2          MS. OLSON:  Yes.  I didn't do it, but there's a

3 well that is used for the three properties, agricultural

4 well, to use for the -- because these three properties are

5 actually a farm.

6          THE COURT:  And is your property one of the three

7 that you're referencing?

8          MS. OLSON:  It is.

9          THE COURT:  Okay.

10          MS. OLSON:  But it's not potable water.

11          THE COURT:  All right.  You can go ahead with your

12 questioning of Mr. Puckett.

13          MS. OLSON:  Okay.

14 BY MS. OLSON:

15 Q    So, Mr. Puckett, you said that you delivered all of

16 these notices to me.  How did you deliver them?

17 A    Well, since you wouldn't come outside or anything, we

18 taped it to the front of your gate facing your house like

19 we've always done with everything when you don't come out.

20 And then when I go home, I take a copy of that, and I always

21 emailed it to you, and I got it in a file in my computer.

22 Q    Did you ever call me and tell me that you were doing

23 these things so I would know to go out there and look or

24 know to look at my email, because, being disabled, I don't

25 go outside.  I don't walk down the front yard.  I don't go

27

1 out.  So did you call me or give me any notice or send it to

2 me through the mail to make sure I got it?

3 A    Maybe you can't go out there.  I don't know.  That's

4 been disputed.  But I know your caretaker can, and he knows

5 they're there.  He was there the first day the police come

6 out.

7          MS. OLSON:  I'm going to object to that.  He

8 doesn't know anything what anybody else knows.

9          THE WITNESS:  Well, I'm not going to get in an

10 argument with you.

11          MS. OLSON:  Then don't.  Just answer my questions,

12 please.

13          MR. DONALD:  I think he did.  I think we're -- I'm

14 going to -- for the record, your Honor, please.

15          THE COURT:  So noted.  Next question, Ms. Olson.

16          MS. OLSON:  I didn't ever hear him answer if he

17 mailed it to me.

18          THE WITNESS:  I sent it in an email.

19 BY MS. OLSON:

20 Q    Mailed it by U.S. Post Office?

21 A    Nope.

22 Q    No, you did not?

23          THE COURT:  The answer is no.

24          MS. OLSON:  Okay.  Thank you.

25 //

28

BY MS. OLSON:

Q    How long was it between the -- the warnings that I --
you posted did you pull the meter?  What was the time frame?

A    I don't have that in front of me.  So I couldn't tell
you.  I do know that earlier, a month before, we started
sending out flyers about concerning water, and I know you
got some of those if you got a water bill because we put
some of them in there.  We hung them up around town.  We
took them around and hand delivered them like we always do
with boil water notices and stuff.  And if -- if you don't
come out -- if you got your gate locked and you don't want
to come out and take it, we tape it to your gate, and that's
how we give it to you.

     And, like I said, I always go home, Kim, and I always
send you an email because I got a file full of them.

Q    Yes, but how do I know you're sending me that email?
That's what I'm saying.  Did you call me and tell me that?

A    I don't have your phone number.

          THE COURT:  All right.  Anything else for this
witness, Ms. Olson?

          MS. OLSON:  Yes.

BY MS. OLSON:

Q    Is it true that the rules of the District state that
you are required to send any notices by the United States
Post Office at least 48 hours before you do anything?

29

1 A     Not to my knowledge.

2 Q     Not to your knowledge.  Okay.  When the judge was

3 reading one of those notices, it said that there was going

4 to be a flow restricter, if this didn't stop, you were going

5 to install a flow restricter.  Did you do that?

6 A     We didn't have a chance.

7 Q     You didn't have a chance?  But you had a chance to pull

8 my meter?

9 A     You got so many violations, so many warnings all at the

10 same time, and you never want to correct nothing.  Even when

11 the Sheriff was there on the bull horn trying to get

12 somebody to come out, nobody would come out.  So --

13 Q     I never heard anything from the Sheriff.  How am I

14 supposed to know?

15 A     I don't know if --

16 Q     I'm in here in bed --

17 A     -- we have them in here or not, but I'm sure it's in

18 the Sheriff's reports.

19      (Pause.)

20          THE COURT:  Any other questions, Ms. Olson?

21 BY MS. OLSON:

22 Q     Do you know if anybody was home at the time?

23 A     Yes.

24 Q     How do you know that?

25 A     Peter was up there working in the garden when the

30

1  Sheriff pulled up and asked for you, and he said you were in

2  your house.  So, as he pulled down there by your house, he

3  walked around in the back and disappeared and never --

4          MS. OLSON:  That's hearsay.

5          THE WITNESS:  -- never to come out again.

6          THE COURT:  All right.  So -- so noted, Ms. Olson.

7  BY MS. OLSON:

8  Q    Do you know of your own personal knowledge if anybody

9  was home when you pulled the meter?

10  A    My own personal knowledge, no, I can't tell you that.

11  Q    Okay.  Thank you.  Did the -- you've mentioned the

12  rules in the HCSD before.  Do those rules require you to

13  give a 48-hour notice between notices about anything?

14  A    Not to my knowledge, they don't.

15  Q    They don't.  Okay.  So if there's nothing that says

16  that you have to give any time between, so you -- you can

17  give a notice of a warning and then pull the meter that day?

18  A    No.  If you got a warning, we wouldn't pull it.  If you

19  got another, you would get a violation.  That's when the

20  flow restricter would go in.  After that -- and it tells you

21  right on those what will happen, that we will pull your

22  meter.

23  Q    Right.  But you just said that you would -- that the

24  flow restricter would be there and then you would pull the

25  meter.

31

1  A    Right.

2  Q    Did you do that?

3  A    Like I said, you had so many warnings and violations.

4  We gave you more than most people get.

5  Q    And -- and how many days was this?

6  A    I don't know, a period of a week and a half, something

7  like that.  I'm not sure exactly.

8  Q    Does it say that anywhere on the notices?  I haven't

9  checked my emails.  I have -- I'm bad about that -- checked

10 my email from something from -- oh, there's Christi's.

11          MS. OLSON:  Sorry, your Honor.  I'm trying to pull

12 up Ms. Pine's email.  Okay.  So I'm reading this

13 declaration, and it says on July 17th, the notice declaring

14 emergency was given.  I'm sorry.  I'm just talking to myself

15 trying to read through this, your Honor.

16          THE COURT:  Could you refer Court and counsel to

17 the page number that you wish to reference?

18          MS. OLSON:  Okay.  I'm looking at the supplemental

19 declaration of Robert Puckett, page two.

20          THE COURT:  And do you have a question for Mr.

21 Puckett regarding page two?

22          MS. OLSON:  Yes, I do.  Just a minute.  I'm trying

23 to get to the notices.  Hold on, your Honor.

24      (Pause.)

25          THE COURT:  All right.  Ms. Olson, I appreciate

32

1   that this is a challenging situation with phone access.

2   We've accommodated that in the hopes of making it easier for

3   you to not have to travel here.  However, we do need to move

4   on with this process.  Do you have any further questions for

5   this witness?

6   BY MS. OLSON:

7   Q    Okay.  Uh -- okay.  So according to your declarations,

8   the -- the notices started on July 19th, is that correct?

9   A    Public notice was put out on the 17th.  We had an

10  emergency meeting on --

11  Q    No.  That's not what I asked.  I said the notice of

12  violation.

13  A    Your first one on July the 19th I guess, yes.

14  Q    Okay.  And then on the 20th, you pulled my meter?

15  A    I don't think it -- no.

16  Q    Well, that's when it was discovered missing.  So if you

17  didn't pull it on the 20th, then I don't know who did.  But

18  it was gone on the 20th.

19  A    Did you park your car on the meter?

20  Q    I didn't park anything anywhere.  So --

21          MR. DONALD:  Well, your Honor, I think this --

22          MS. OLSON:  I don't drive.  So --

23          THE COURT:  I think that concludes this witness's

24  testimony.

25          Counsel, do you have anything further by way of

*Echo Reporting, Inc.*

33

1  redirect?

2          MR. DONALD:  No.  Thank you, your Honor, I don't.

3          THE COURT:  All right.  Ms. Olson, you're still

4  going to have the opportunity to respond to the arguments

5  that counsel has raised, but I'm going to excuse this

6  witness at this time.

7          Mr. Puckett, thank you for your testimony, and you

8  can go ahead and have a seat.

9          Ms. Olson, anything else that you wish to be heard

10 on with regards to the arguments that counsel has raised?

11         MS. OLSON:  Pardon me?

12         THE COURT:  Is there anything else that you wish

13 to be heard on with regard to the arguments that counsel has

14 raised?

15         MS. OLSON:  Let me look over my notes about what

16 counsel said.

17     (Pause.)

18         MS. OLSON:  Okay.  I just need to express to the

19 Court that I feel pretty ambushed by counsel bringing Mr.

20 Puckett in here to testify because I could have had other

21 witnesses had I known they were going to do this.  But, not

22 knowing this, I didn't have my witnesses here to be able to

23 testify on my behalf, because there are some conflicting

24 statements.  And trying to give me the hearing that I should

25 have had before they pulled my water meter so we could

34

1  discuss, you know, the no water issue and whatnot.  But they
2  just pulled the meter instead.  So I feel a little out of
3  sorts about this.  I guess you can say that.  I wasn't given
4  my due process.  You know, there's certain things they need
5  to do.  The law says that they have to do them.  They didn't
6  do it, and that's basically why we're here.
7              THE COURT:  When -- Ms. Olson, when you say they
8  didn't do it, is it your contention that you received none
9  of these warnings or notices that --
10             MS. OLSON:  No, I did not.  Like I said --
11             THE COURT:  -- counsel has provided?
12             MS. OLSON:  -- I can't get outside, and if Mr.
13  Puckett was sending me these things and would have called me
14  and told me, I could have checked my email.  But I sit here
15  most of the day, and I watch TV, and I pet my cats.  And
16  that's -- that's how i live.  And so, you know, without
17  knowing that this stuff is going on, I was --
18             THE COURT:  So it's your representation to the
19  Court that you received none of these warnings or notices
20  that Mr. Puckett has made reference to?
21             MS. OLSON:  Not until after I knew that they had
22  pulled my meter.
23             THE COURT:  All right.  Anything further, Ms.
24  Olson?
25             MS. OLSON:  That's -- hold on.  Let me -- let me

35

1    -- I'm checking my notes.

2         (Pause.)

3              MS. OLSON:  I just wanted to comment on something

4    your Honor noticed when looking at these notices, that they

5    weren't even signed, you know.  And, looking at them,

6    they're not signed.  And so it's -- it's kind of not -- who

7    sent these if they're not signed, and so that's just what I

8    wanted to say.

9              THE COURT:  All right.  Thank you, Ms. Olson.

10             Counsel, anything further?

11             MR. DONALD:  No, your Honor.  Submitted.  Thank

12   you, your Honor.

13             THE COURT:  All right.  This matter will be

14   submitted.  The Court will consider the arguments and the

15   materials that have been filed.  I want to notify both

16   parties and particularly in light of your representation,

17   Ms. Olson, that you don't check your email, that it would be

18   an important time to do that and be aware of the orders and

19   rulings from this Court.

20             The next step in this process is the issuance of a

21   finding and recommendation, which then starts a 14-day

22   deadline to file an objection to that.  From there, the

23   opposing party also has time to respond, and I'm going to

24   refer the parties to the rules associated with that.  I

25   believe it's Rule 72 of our Local Rules.  But you need to be

36

1  aware of those deadlines and respond accordingly.  In the

2  absence of a response, the Court's going to go ahead with

3  action on this matter consistent with the findings and

4  recommendations.  Those findings and recommendations go to

5  the District Court.  Ultimately, the District Court will

6  make a decision about the availability of injunctive relief

7  and either set a further preliminary injunction hearing or

8  make a ruling from there.

9           In light of those statutory periods for notice, I

10  want a final confirmation, Ms. Olson, of what your current

11  water situation is, recognizing that the process of this

12  adjudication is going to involve at least 14 days' notice

13  period.

14           What is your current water status?

15           MS. OLSON:  I have enough water for another day,

16  and that's about it, and I don't know how I'm going to -- I

17  don't even -- I can't come up with money for more water

18  delivery.  So that's my water situation.

19           THE COURT:  All right.  Anything further, Counsel?

20           MR. DONALD:  Your Honor, obviously this is the

21  first that I've heard that there's a well on her land.  I

22  understand that that's an agrarian well.  I just don't

23  understand how all the water was used, 6,000 gallons a day.

24  That's not coming from the well.  I just want to make sure

25  we understand that.

37

1          THE COURT:  And, I'm sorry.  Did you say 6,000
2   gallons a day?
3          MR. DONALD:  Yes.  Instead of 200, she was using
4   -- is it 6,000?
5          MR. PUCKETT:  Yes.
6          MR. DONALD:  -- 6,000 plus per day.
7          THE COURT:  Ms. Olson, do you wish to be heard on
8   that contention by the District?
9          MS. OLSON:  Yes.  That is absolutely insane, your
10  Honor.  Do they have any documentation to show this?
11         MR. DONALD:  It's in the declaration, your Honor.
12  And we can provide you with the reading -- the reader -- the
13  readings, the meter readings.  And we'll provide both you
14  and -- and Ms. Olson.
15         THE COURT:  And other than declaring it insane, do
16  you wish to be heard as to the amount of use that you
17  contend you were actually doing?
18      (Pause.)
19         THE COURT:  Hearing none, this --
20         MS. OLSON:  No.  Hold on, your Honor.  Yes --
21         THE COURT:  Excuse me, Ms. Olson.
22         MS. OLSON:  Yes.  Are you there?
23         THE COURT:  I direct this hearing, and "Hold on"
24  is not an appropriate response.  I appreciate that you don't
25  have legal training and you're proceeding pro se, but

38

1  there's a certain decorum in the court, and "Hold on" is not

2  part of that.  Do you understand?

3          MS. OLSON:  Yes.  I'm sorry, your Honor, but my --

4  I dropped my medication and was trying to pick it up, and I

5  just was -- didn't want to miss what you were saying.  So

6  I'm sorry, your Honor.

7          I want to let you know about me not checking my

8  email.  I don't check my email because the service I have

9  goes out all the time, and so it wasn't consistent.  But I

10 have since borrowed a laptop.  So I'm able to check that.

11 So I will be doing that on a daily basis for you, and now I

12 completely lost what you were saying before.

13         THE COURT:  All right.  Well, this matter will be

14 deemed submitted.  And, again, the Court's going to issue

15 findings and recommendations based on the arguments and

16 papers filed.

17         Thank you, Ms. Olson.

18         Thank you, Counsel.

19         MR. DONALD:  Thank you, your Honor.

20         MS. OLSON:  Your Honor, can I submit further

21 declarations based on what was brought into court this

22 morning?

23         THE COURT:  I'll entertain that request, though it

24 presents a concern that if the Court's going to wait for

25 additional briefing and, in fact, you're out of water --

39

1          MS. OLSON:  Okay.

2          THE COURT:  -- then it --

3          MS. OLSON:  I understand.  No, I know.  I know.

4  I'm just --

5          THE COURT:  -- it seems to weigh against the

6  urgency of the matter.  But if you want to request time for

7  additional briefing --

8          MS. OLSON:  No, your Honor, I don't.

9          THE COURT:  -- you're -- you're most aware of your

10 situation.  We can -- we can hold back, but the 14-day

11 period for responding to the findings and recommendations

12 won't begin until those findings are issued.

13         MS. OLSON:  Right, your Honor.  And -- and since

14 I'm going to be out of water -- I was just trying to figure

15 out how I can talk about the 6,000 gallons because there

16 wasn't any water coming out of the tap and whatnot.  That's

17 -- that's what was on my mind, but I see your Honor's point.

18         THE COURT:  All right.  Matter will be deemed

19 submitted.  Thank you.

20         MR. DONALD:  Thank you, your Honor.

21         MS. OLSON:  Thank you, your Honor.

22     (Proceedings concluded.)

23

24

25

40

1       I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Crystal Thomas        9/18/2021
  Transcriber, AAERT CERT *654  Date
6
  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
  /s/L.L. Francisco
9 L.L. Francisco, President
  Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*