**FILED**

Kimberly R. Olson
PO Box 243, Hornbrook, CA 96044
kimberlyrenee@yahoo.com (email not for service)
(530) 475-3669

FEB 2 2 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ **Amc** _____
DEPUTY CLERK

## THE UNITED STATES DISTRICT COURT

## IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kimberly R. Olson,<br><br>          Plaintiff,<br><br>vs.<br><br>Robert Puckett, Sr., et al,<br>          Defendants, | Case No: 2:21-cv-1482 KJM DMC (PS<br><br>PLAINTIFF'S NOTICE OF MOTION AND<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT AS TO DEFENDANTS<br>PUCKETT, HCSD, AND DINGMAN<br><br>Date: March 23, 2022<br>Time: 10:00 a.m.<br>Place: Redding Courthouse<br>Judge: Hon. Dennis M. Cota |

TO ALL PARTIES, AND THEIR COUNSEL OF RECORD; PLEASE TAKE NOTICE

that on March 26, 2022, at 10:00 a.m., at the Federal Courthouse located at 2986 Bechelli Ln., in

Redding, CA, the Plaintiff, Kimberly R. Olson ("Plaintiff" or "Olson"), will move for a Partial

Summary Judgment ("Motion") on certain of the claims brought under 42 USC §1983 in the

First Amended Complaint (ECF #44), pursuant to FRCivP 56 as to Defendants Clint Dingman

("Dingman"), Hornbrook Community Services District ("HCSD", or "District"), and Robert

Puckett, Sr. ("Puckett") (collectively "Defendants" herein).  The Court should enter Judgment in

Plaintiff's favor, and against these Defendants, as to the claims and facts identified, as no

disputed material facts are at issue, and Plaintiff is entitled to judgment as a matter of law based

upon those undisputed facts, and/or because the Defendants cannot meet **their** burden as a

governmental agency, and government agents, to establish facts sufficient to prevent a finding in

Plaintiff's favor as a matter of law.  At this time, Plaintiff only seeks to establish liability of these

Defendants as to the specific portions of her claims, and the specific facts set forth; and, to

ascertain issues of fact and law, so that the proceedings will be narrowed, less complex, and less

consuming of time and resources moving forward.  Plaintiff does not waive any of her other

claims or allegations in the FAC merely because they are not brought herein.

## COMMON UNDISPUTED FACTS AND ELEMENTS OF CLAIMS

The Undisputed Facts of this Motion are submitted on a separate document, and are also referenced throughout this Motion.  Plaintiff relies on documents and pleadings already submitted to the Court, and does not submit any further declarations or affidavits at this time.  Although Plaintiff has attempted to comply with proper procedure, she reserves the right to seek to amend, add to, or delete information from that document, and this Motion, as may be necessary, and/or as ordered by the Court

## GENERAL PRINCIPLES OF DUE PROCESS, AND WARRANTLESS ACTS BY THE HCSD, PUCKETT, AND DINGMAN

Several of Plaintiff's claims involve alleged violations of "due process" by these Defendants, and so there are general principles of "due process" that are common to many of Plaintiff's Claims in the FAC, and those which are the subject of this Motion.  Plaintiff has set forth applicable general principles and legal criteria below, and incorporates them by reference into each of the following sections concerning the "Counts" at issue in this Motion.

The fundamental requirement of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (emphasis added). The Supreme Court has described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *7 Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis added).   The right to notice and an opportunity to be heard protects the individual not just from mistaken deprivations; these rights protect a person's right to make a record for later review, and against unfair deprivations as well. *Fuentes v. Shevin*, 407 U.S. 67 (1972).

Thus, due process actually has twin prongs, both of which must be provided by a governmental entity because procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. "Due process" in all cases requires; 1) "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950) (emphasis added); and, 2) some form of hearing is **before** an individual is finally deprived of a property interest. (*Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974). See, e. g. *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 596-597 (1931). See also *Dent v. West Virginia*, 129 U.S. 114, 124-125,

(1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is thus the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, (1965). See *Grannis v. Ordean*, 234 U.S. 385, 394, (1914).

This action concerns in large part the termination of Plaintiff Olson's water service, and the methods employed by Defendants HCSD, Puckett, and Dingman to accomplish that termination (with the aid, assistance, and ratification of the other Defendants), and it is that aspect of the case that will be addressed in this Motion for Partial Summary Judgment. The Supreme Court, in a case that is directly on point, *Memphis Light, Gas Water Div. v. Craft*, 436 U.S. 1, (1978), the Court held that the "notices" provided by the utility company **failed the due process test** because they did not provide any information about a hearing, nor how to obtain one[1]. The Court went on to specify that the "hearing" mandated by due process required, at a minimum, information and an "opportunity for a meeting with a responsible employee empowered to resolve the dispute." *Id.* at 18[2]. In so finding, the Court relied on a previous case that found the government must provide the "essence of due process ... [by providing] 'a person in jeopardy of serious loss . . . notice of the case against him and opportunity to meet it,'" *Mathews v. Eldridge*, 424 U.S. 319, 348, (citing *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951). The "notices" by Puckett and the HCSD, ECF #26, also fail this test.

Unsurprisingly, for decades, California courts have also heeded the straightforward rule of requiring fully effective notice, both as due process principle and as a procedural rule. *Menefee & Son v. Dep't of Food & Agric.*, 245 Cal. Rptr. 166, 170 (Ct. App. 1988) ("[A]t a minimum, due process requires notice and an opportunity for a hearing."); *People v. Wilshire Ins. Co.*, 119 Cal. Rptr. 917, 920 (Ct. App. 1975) ("[I]n an adversary proceeding where an order

---

[1] This case also clearly illustrates the error that many people make when they say "notice and opportunity for hearing" as being separate components of due process, because *Memphis* specifies that information about a hearing must also be part of a "notice", or it simply is *not* **true** notice in the Due Process sense of the term (that is, an agency cannot just call something a "notice" and magically have it be so, as was done here [ECF #26]). Indeed, this vernacular confusion has infected and derailed this case already to a great degree (and Plaintiff recognizes her own unclear use of the term "notice" as contributory), and so this Motion is an attempt to get back on the correct legal track, and standard of definitions for the two concepts unfortunately using the same word.

[2] See also *Memphis*, 436 U.S. at 14: "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'"

may affect the rights of an adverse party, notice must be given to protect the adverse party's right to be heard on the issue as a matter of due process of law."). Yet in the case now before the Court, no notice concerning **any** hearing(s) was provided by the HCSD and Puckett to Plaintiff, and instead it is clear that Puckett simply approved his own accusations in the "notices"[3]. (ECF #26; #36.)

This case confirms why the right to notice and an opportunity to be heard are so fundamental; because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Fuentes*, 407 U.S. at 81 (quoting *Joint Anti- Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)).

Generally speaking, Plaintiff seeks Summary Judgment on the due process issues relating to the allegations and causes of action in the FAC that:

1) The "notices" purportedly provided to Plaintiff by the HCSD and its President, Defendant Puckett, were Constitutionally-deficient in **content,** so resulted in a failure to give **true** notice as required by Due Process. That is, on their face, the **information** they conveyed did not meet the minimum due process standards designated by the Supreme Court, and the 9th Circuit[4] to permit termination of Plaintiff's water service, and cannot be said to have done so.

2) Plaintiff was subject to invasion and deprivation of liberty and property interests; other adverse actions by the HCSD, Puckett, and Dingman, including termination of her water service; without being afforded **any** pretermination **hearing**(s), or even any *opportunity* for such hearing(s), as to the allegations against her in each (or any) of the "notices", and so she was denied due process as to each of the "notices", and also concerning the ultimate termination of her water service, on that basis - in addition to any others.

3) Plaintiff was subject to trespass, search, and seizures of her real and personal property, and property interests[5], by the HCSD, Puckett, and Dingman, **who acted at all times absent any**

---

[3] This in itself is another due process violation, as a party has the right to have their "hearing" before a neutral party/judge.

[4] See *Memphis, supra*, 436 U.S. 1, at p.14 ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'"). Thus, true "notice" for Constitutional standards must be produced with the correct information that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane, supra*, 339 U.S. at 314; *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999) (holding the form of notice must be sufficient to ensure the opportunity to be heard is "meaningful."). On that basis, the issue of if, and/or when, Plaintiff may have been given and/or received such legally incomplete and ineffective "notices" is immaterial.
[5] Including her "right to exclude others" which is "perhaps the most fundamental of all property interests." *Lingle v. Chevron*, 544 U.S. 528, 539 (2003).

consent, warrant, or other court order or judgment for their actions, and so those trespasses, searches, and seizures are *per se* unreasonable under the Fourth and Fourteenth Amendments. See *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) "[a] seizure conducted without a warrant is per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." These Defendants cannot meet what is now **their** burden to prove any lawful basis for such trespass, searches, and/or seizures of Plaintiff's real and personal property as was undertaken by them at her home on multiple occasions  (ECF #26, #36, #44).  See, i.e., *People* v. *Schmitz* (2012) 55 Cal.4th 909, 933 (2012); *Coolidge v. New Hampshire* 403 U.S. 443, 455 (1971).

## CLAIMS UPON WHICH JUDGMENT IS SOUGHT

### 1.  Federal Constitutional Violation Claims Brought under 42 USC §1983

### Count I[6]  4th Amendment Violation; Trespass, Search and Seizure of: Real Property (Curtilage), Vehicles, Water Meter, and the Piping to Plaintiff's Residence Without any Warrants by HCSD, Puckett, and Dingman

The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const. amend. IV.)  Thus, the Fourth Amendment generally requires that, absent consent or exigent circumstances, government officials must have a valid warrant, supported by probable cause to believe that the search will uncover evidence of a crime, in order to lawfully conduct searches[7], and/or to seize property. *Jones v. United States*, 357 U.S. 493, 497-98 (1958); see also *Groh v. Ramirez*, 540 U.S. 551, 558-59 (2004).  For purposes of Fourth Amendment analysis, a seizure is any "meaningful interference with an individual's possessory interests in [his] property." *Soldal*

---

[6] The identification of the claim under discussion shall be identified by its corresponding "Count" and description in the FAC (ECF #44). The allegations of the FAC actually encompass *multiple instances* (and so a plurality of actual claims) of conduct which are grouped under the "count" which identifies the right common to those violations. For purposes of Summary Judgment, Plaintiff has identified the particular individual facets of the claim that specific conduct of the Defendants violated, and also identified individual instances of conduct that violated the same right on multiple occasions.

[7] As with actual seizures of property, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 390.) "The burden is on the People to establish an exception applies." (*People v. Macabeo*, 1 Cal. 5th 1206, 1213 (2016).)

1   *v. Cook County*, 506 U.S. 56, 61 (1992) (internal quotation marks and citation omitted); *United*

2   *States v. Jacobsen,* 466 U.S. 109, 113 (1984).

3           See also *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1028-29 (9th Cir. 2012):

4           "Following *Soldal,* we recognized that a reasonable expectation of privacy is not required
            to trigger Fourth Amendment protection against seizures. In *Miranda v. City of*
5           *Cornelius,* 429 F.3d 858, 862 n. 2 (9th Cir.2005), for example, the plaintiffs admitted that
            they had no reasonable expectation of privacy in their parked car, but they nevertheless
6           challenged the city's impoundment of the vehicle as an unreasonable seizure. We held
            that the seizure was subject to the Fourth Amendment's reasonableness standard because
7           "[t]he Fourth Amendment protects against unreasonable interferences in property
            interests regardless of whether there is an invasion of privacy." *Id.* at 862 (citing *Soldal* ).
8           Other circuits are in accord. *See United States v. Paige,* 136 F.3d 1012, 1021 (5th
            Cir.1998) ("The Supreme Court recently made clear that the protection afforded by the
9           Fourth Amendment extends to an individual's possessory interests in property, even if his
            expectation of privacy in that property has been completely extinguished.")
10          (citing *Soldal* ); *Lenz v. Winburn,* 51 F.3d 1540, 1550 n. 10 (11th Cir.1995) ("It is true that
            a possessory interest is all that is needed for the Fourth Amendment's reasonableness
11          requirement to apply to a *seizure.*") (citing *Soldal* );*Bonds v. Cox,* 20 F.3d 697, 702 (6th
            Cir.1994) ("[O]ur finding that Bonds had no reasonable expectation of privacy in the
12          house at 4174 Dunn Avenue does not affect our conclusion that Bonds has standing to
            challenge the seizure of her property.")."
13

14

15          The Supreme Court's cases thus unmistakably hold that the Fourth Amendment also

16  protects property even where privacy or liberty is not implicated. See, *e.g., ibid.; Katz v. United*

17  *States,* 389 U.S. 347, 350 (1967). The Supreme Court's "plain view" decisions also make "plain

    view" seizures scrupulously subjected to Fourth Amendment inquiry, *Arizona v. Hicks,* 480 U.S.

18  321, 326-327 (1987). Furthermore, the Fourth Amendment protects seizures even when no

19  "search" within its meaning has taken place. See, *e.g., Jacobsen, supra,* 466 U.S., at 120-125.

20  The "basic purpose of this Amendment is to safeguard the privacy and security of individuals

    against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and*
21
    *County of San Francisco*, 387 U. S. 523, 528 (1967).

22          The Supreme Court states that, "[a] seizure conducted without a warrant is *per se*

23  unreasonable under the Fourth Amendment—subject only to a few specifically established and

24  well delineated exceptions." *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)

    (internal quotation marks and citation omitted).  Allegations of generalized public benefit, or of
25
    "public safety" by officers of a local water district are not one of those exceptions. See *Mincey v.*

    *Arizona*, 437 U.S. 385, 391–92 (1978) (public safety needs did not "justify creating a new

    exception to the warrant requirement").  Other cases confirm that the warrant requirement

    Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 6

applies even to searches allegedly based on public safety needs. See *Los Angeles v. Patel*, 576 U.S. 409, 419–23 (2015) (enforcing warrant requirement for non-investigatory motel records search); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21 (1978) (enforcing warrant requirement for OSHA inspections of businesses).

Further, if an aggrieved party brings a motion challenging a warrantless search or seizure, "the government carries the burden to bring the case within one of the exceptions to the warrant requirement." 3A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 689 (West 4th ed. 2020 Update.) If there is any initial burden on the defendant, it is slight: "once [the defendant] demonstrates that a warrantless search or seizure occurred, the burden shifts to the government to demonstrate a justification or exception to the warrant requirement." *United States v. Guevara*, 745 F. Supp. 2d 1039, 1043 (N.D. Cal. 2010) (Alsup, J.); *Coolidge v. New Hampshire* 403 U.S. 443, 455 (1971); *People* v. *Schmitz* (2012) 55 Cal.4th 909, 933 (2012). *Macabeo, supra,* 1 Cal.5th 1206, 1213.

Trespass onto private property (including chattels) by agents of the government without a warrant is presumed to violate the Fourth Amendment's prohibition on unreasonable searches. The property "owner's right to exclude others" is "perhaps the most fundamental of all property interests." *Lingle v. Chevron*, 544 U.S. 528, 539 (2003). The Founders were particularly concerned with property rights. For this reason, the Fourth Amendment secures a list of property interests, including "houses," from arbitrary government intrusions. The Supreme Court has reaffirmed the importance of the property interests the Fourth Amendment protects through a string of recent decisions. In *Collins v. Virginia*, 138 S. Ct. 1663 (2018), it held that warrantless physical intrusions into the curtilage were *per se* unreasonable, even for the purpose of searching a vehicle for which there was probable cause of criminal involvement. *Id*. at 1671–72.

Since it is the Government's burden of establishing any alleged right to search, or seize, private property without a warrant (or other judicial process), in **every** respect, ss applied to this action, that means the HCSD, Puckett, and Dingman bear the burden of proving, by production of competent evidence, that they did not need a warrant, nor any judicial order or judgment, to undertake the trespasses, searches, and seizures of property (including Plaintiff's water service) they committed at her home from the period of on or about July 19-23 of 2021. (ECF #26, #36, pp.9:17-23, 17, 19-22, 28-31.) See, i.e., *United States v. Hawkins, supra,* 249 F.3d at 872.

Moreover, given the evidence that this "raid" by the HCSD, Puckett, Dingman, and their summoned agents of law enforcement was planned in advance over the course of some days, the failure of these Defendants to abide by the HCSD's own Rules about timing of notice, methods

of delivery, and time to correct any "violation" alleged (ECF #34, Sections 2.10, 4.03), as well as the failure to actually provide any hearing (or means for a hearing) as required by California and Federal law before engaging in these actions at Plaintiff's home, means the Rules failures rise to the level of a Due Process violation themselves, and so smacks of at least wonton recklessness towards Plaintiff's Constitutional rights. See *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012):

> "As we have repeatedly made clear, "[t]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Clement v. City of Glendale,* 518 F.3d 1090, 1093 (9th Cir.2008). This simple rule holds regardless of whether the property in question is an Escalade or an EDAR, a Cadillac or a cart. The City demonstrates that it completely misunderstands the role of due process by its contrary suggestion that homeless persons instantly and permanently lose any protected property interest in their possessions by leaving them momentarily unattended in violation of a municipal ordinance. As the district court recognized, the logic of the City's suggestion would also allow it to seize and destroy cars parked in no-parking zones left momentarily unattended."

Other than Puckett's repeatedly claiming that generally the HCSD Rules and Regulations give the HCSD and its officers the authority to trespass onto Plaintiff's property (the curtilage of her home), seize vehicles, seize Plaintiff's water piping by locking it off[8], seize Plaintiff's water meter (and assume ownership of it as well), and terminate her water service whenever they feel like doing so (without any hearings or warrant ever being had ECF #36, pp.9:17-23, 16, 17, 19, 21, 28-29),  Defendants HCSD, Puckett, and Dingman have produced no explanation - much less any evidence - showing how they were excused from the requirement of first obtaining a warrant before investigating alleged "violations" of HCSD Rules and Regulations, and/or criminal

---

[8] It is not disputed that the HCSD is responsible for, and owns, the "supply side" of the pipes which run from the water main to the meter.  Similarly, it is not disputed that Plaintiff is responsible for, and owns, the pipes which run from the meter to her home. Defendant Puckett testified that during the process of removing Plaintiff's meter and terminating her water service purportedly pursuant to HCSD's Rules and Regulations, and customs and practices, Defendants Puckett, Dingman, and HCSD also seized Olson's piping going to her home by placing a lock on that piping which capped it off, making it impossible for Plaintiff to connect any alternative water source.  Puckett testified at the TRO hearing that the placing of the lock was for the purpose of keeping "debris and dirt" out of the pipe, but he did not explain why a lock was necessary to do so, rather than a simple cap, and he did not provide Plaintiff with a means to remove the lock if she needed to do so.  (ECF #3, p.4, #4, p.2:13-20, #36, p.21; #44, pp.5-6.)

Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 8

activity (ECF #26, #36), by seizing real and personal property[9] (ECF #36, pp.9:17-23, 17, 19-22, 28-31), and, by seizing Plaintiff's possessory property interest in her water service - particularly prior to there being any hearing(s) to determine any purportedly lawful basis for them to do so - or even the elapsing of the "not less than two, nor more than seven working days" time to "correct" violations specified in the Rules and Regulations at Section 4.03.  (ECF #29, p.15:25-28.)

In *Camara v. Municipal Court* (1967) 387 U.S. 523, the United States Supreme Court held that in nonemergency situations a nonconsensual administrative inspection of a private residence is subject to the requirements of the Fourth Amendment so that the administrative agency (such as the HCSD) must first obtain an inspection warrant from a judge before the premises may be inspected for possible violations.  A governing principle of Fourth Amendment jurisprudence is that "a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant." (*Id.* at pp. 528-529 [holding that "administrative searches" of the sort contemplated by, and/or actually undertaken by Puckett[10] as being permitted "by the rules and regulations", concerning Plaintiff's driveway (and vehicles parked thereon), water meter, meter box, and water pipe to her home, violated the Fourth Amendment due to not being conducted with proper consent or accompanied by a warrant [see *id.* at p. 534]).

Code of Civil Procedure section 1822.50 *et seq* were enacted to comply with the standards enunciated in *Camara v. Municipal Court, supra*, 387 U.S. 523. (People v. Firstenberg (1979) 92 Cal. App. 3d 570, 583.)  As part of this statutory framework, section 1822.56 sets forth the specific procedures which must be complied with in executing an inspection warrant. This section provides that "An inspection pursuant to this warrant may not be made between 6:00 p.m. of any day and 8:00 a.m. of the succeeding day, nor in the absence of an owner or occupant of the particular place ..." to be inspected "unless specifically authorized by the judge upon a showing that such authority is reasonably necessary to effectuate the purpose of the [ordinance] being enforced." The statute also **explicity** provides that an inspection pursuant to a warrant "shall not be made by means of forcible entry, except that the judge may expressly authorize a

---

[9] Including Plaintiff's "possessory interest" in her real property, and any items that rest thereon - along with her property right to "exclude others" from the curtilage of her home (*Lingle v. Chevron*, 544 U.S. 528, 539 (2003)).
[10] ECF #26, pp.3, 22, 25;  #36, pp.16, 19:16-21, 20:16-24.

forcible entry where facts are shown sufficient to create a reasonable suspicion of a violation of a ... law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning, which, if such violation existed, would be an immediate threat to health or safety, or where facts are shown establishing that reasonable attempts to serve a previous warrant have been unsuccessful. ..." The statute concludes with the admonition that "Where prior consent has been sought and refused, notice that a warrant has been issued must be given at least 24 hours before the warrant is executed, unless the judge finds that immediate execution is reasonably necessary ...."

Generally speaking, the HCSD and its minions have no police powers. If they believe that a violation of their rules exists concerning a customer's real or personal property, they are required to get consent to come onto/interact with that property, or seek an "inspection warrant" prior to accessing/interacting with the property and conducting any inspection. See, i.e, California Government Code §61069 (directly applicable to special districts such as the HCSD); Code of Civil Procedure §1822.50, *et seq*; Water Code §31144.1; Health and Safety Code §2053. Notably, "inspection" warrants (which may not even be executed after 6pm and before 8am per Code of Civil Procedure section 1822.56[11]) **do not allow for the HCSD to undertake, or to order, seizure of any items or property**, and Puckett's involvement of the police does not magically transform the HCSD's administrative-powers investigative efforts into a legitimate expedition for evidence to support a criminal complaint[12], while the actions attempting to do so are clearly illegal under the precedent of the Ninth Circuit. C.f., *U.S. v. Grey,* 959 F.3d 1166 (9th Cir. 2020) (upholding suppression ruling by District Court relating to exceeding scope of inspection warrant). See also *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). For that reason, "warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id*. (emphasis added; citations and quotation marks omitted).

Unlike a search for criminal evidence, an administrative search for regulatory violations ordinarily does not entail the "exigent circumstances" that may confront officers in the search for

---

[11] The restrictions against forcible entry of this section also apply to vehicles.
[12] The Defendants admit that as part of their actions relating to seizing vehicles and terminating Plaintiff's water service, they threatened to, and then actually did, file a criminal complaint against Plaintiff on August 31, 2021. See Declaration of Robert Puckett, ECF #17, Attach. 5, Exhibit A; "supplemental" Declaration of Robert Puckett, ECF #26, Exhibits F and G.

1  contraband, i.e., the possible destruction of the evidence, the prospect of the occupant's flight and

2  the risk of harm to the officers carrying out the search.

3          The Defendants' own testimony and documentary evidence establishes that they did

   indeed undertake the conduct against Plaintiff as alleged, and that **they did not possess** - and

4  indeed did not even bother to seek - **any warrant**(s) before doing so.  They have thus admitted

5  under oath, and by way of their declarations, that they also failed, without excuse, to comply

6  with the restrictions of the Fourth Amendment in regards to their conduct involving Plaintiff, her

7  real and personal property, and her property interests, as a matter of law.  (ECF #26, #36.)

8          There is no justification or legal defense they can muster to excuse their admitted

   violations of Plaintiff's Fourth Amendment rights in trespassing onto Plaintiff's real property,

9  having vehicles towed (on each occasion thereof), seizing Plaintiff's water meter, seizing

10 Plaintiff's pipe leading to her home from the driveway by locking it off so that she could not

11 connect to an alternative water source, and seizing her water service by terminating it - all of

   those things being accomplished without any hearings, and without being in possession of a valid
12
   warrant.  Plaintiff is thus entitled to judgment in her favor, and against these Defendants, on this
13
   claim.

14 **Count I  5th Amendment Violation; Seizure and Conversion of Plaintiff's Water Meter in**

15           **Violation of the Takings Clause by HCSD, Puckett, and Dingman**

16          To justify the seizure of private property without a warrant (or other process), the

   Government bears the burden of establishing its right to do so.  This is because seizures of
17
   property without a warrant or determination by a Court are *per se* unreasonable under the Fourth
18 Amendment, and it is the burden of the government agency undertaking the seizure to prove its

19 legitimacy in every respect. See, i.e., *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir.

20 2001).  It is therefore not Plaintiff's burden here to prove anything other than that the taking

   occurred - which is not hard in this case since the Defendants readily admit they did so.
21
          In this instance, Defendants Puckett, Dingman, and HCSD seized Plaintiff's privately-
22
   owned water meter (ECF #4, p.1:21-25; #36, pp.17:4-5, 19, 20:11-12; #42, p.3:6-7; #44, p.11:3-

23 10), and then, while stating via the testimony of Puckett that they did not in fact know if Plaintiff

24 owned her meter or not[13], claimed that the HCSD's Rules and Regulations automatically convert

25
   _____
   [13] Obviously, if the government "doesn't know" if it has the right to control property that it seizes or not,
   or thinks only that it might based upon the "understanding" of Puckett, then it cannot, as a matter of law,
   meet its affirmative burden to establish any right to seize that private property.  It is also worth noting that
   the "policies and procedures" and/or "rules and regulations" of the HCSD cited generally by Puckett and

   Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 11

ownership of Plaintiff's meter to the HCSD - a position that is at odds with the Takings Clause of the US Constitution[14].   (ECF #36, pp.16:2-17.)

Where the Government seizes property not to preserve evidence of criminal wrongdoing but to assert ownership and control over the property, its action must **also** comply with the Due Process Clause. See, e. g., *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974); *Fuentes v. Shevin*, 407 U. S. 67, 48-52 (1972).   The actions of Defendants HCSD, Puckett, and Dingman in seizing Plaintiff's water meter fail to do so.

Here, there was **never** any notice given to Plaintiff that the HCSD, Puckett, and Dingman sought to seize and convert Plaintiff's water meter in order to assert ownership and control of it purportedly pursuant to the "rules" of the HCSD (ECF #26), **and** Plaintiff <u>was **never** given **any** opportunity for a hearing</u> to contest or to be heard concerning that seizure and conversion of the water meter by these Defendants. (*Id.*)  Moreover, these Defendants failed to pay Plaintiff any just compensation for the value of the water meter they seized and appropriated to the ownership and use of the HCSD pursuant to Puckett's interpretation of the HCSD's "policies and procedures" (ECF #36, p.16:2-3).   These Defendants thus failed <u>utterly</u> to comply with **any** aspect of Due Process in this regard.   Plaintiff is therefore entitled to judgment in her favor, and against these Defendants, on this aspect of her 5th Amendment claim, and these Defendants must either return ownership of her meter to her, or pay Plaintiff the cost of the water meter in just compensation.

## <u>Federal Count II - Deprivation of Due Process by Submission of Knowingly False Evidence at Federal Court Hearing by HCSD and Puckett</u>

Defendants HCSD and Puckett acted to use their official statuses as a public entity and public officer to willfully and knowingly fabricate, and submit, false evidence to the US District Court for the Eastern District of California, in order to corrupt the legal process Plaintiff had initiated in that Court, and to deny her due process during the TRO hearing held on September 14, 2021. (See, i.e., *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).)   Puckett, in his capacity as President of the HCSD, and pursuant to its customs, policies, and practices of not giving notice to water customers of the right to a hearing to contest alleged "violations", <u>and</u> of

---

his Counsel as the supposed basis for ownership of Plaintiff's meter did not go into effect until 2013, while Plaintiff became a customer of the HCSD in 2006 (ECF #4, p.5; #44, p.4:8-11), and owns her water meter and meter box (Olson Declaration, ECF #42, p.3:6-7).  neither do those Rules trump the provisions of the United States Constitution.

[14] The Takings Clause of the Fifth Amendment to the United States Constitution reads as follows: "Nor shall private property be taken for public use, without just compensation."

not **providing** any hearings to contest alleged "violations", submitted a declaration to the Court (ECF #26) containing statements that he knew Plaintiff Olson had not been provided any opportunity to contest with the HCSD[15], and that were not true, in order to use his official position to introduce false evidence against Plaintiff Olson[16]. Later, during cross-examination before this Court at the hearing, he testified to facts demonstrating that at least some of his statements in his Declaration were not true on their face.

In his ECF #26 Declaration, Puckett, in both his individual, and official capacity on behalf of the HCSD, made the following false statements (as underlined):

1) "On July 23, 2021, Ms. Olson was issued another violation for obstruction and outside watering, and at that time the sheriff was called out to have her remove the obstruction which she refused to do. It was explained to her that if she did not remove the car which she had again parked on top of the meter, that it would be towed away by the sheriff's office. When she refused again, her car was towed." (ECF #26, p.3:3-7.)

2) "On July 23, 2021, Ms. Olson was issued with another violation to remove an obstruction of her water meter and placed on notice that if the obstruction was not removed that her water would be disconnected and her meter removed. Due to her refusal to the district, the

---

[15] Indeed, Puckett's actions as he and his Counsel admitted them at the hearing (ECF #26, pp.3, and 16-25; #36., pp.9:14-23, 10:8-16, 14:9-20, 17:3-6, 19:4-24, 20:16-24, 26:15-21, and 28-32) clearly demonstrate that he was required, as the officer of an administrative agency, and particularly as restricted by Government Code §61069, to obtain an "inspection warrant" from a detached magistrate (Code of Civil Procedure §1822.50, et seq) to do any of those things - and would have had to have sought, and gotten approved, a special order for "forcible entry" as to Plaintiff's property, and/or to enter or seize any vehicles at the scene. Instead, Puckett just decided he would ignore any and all warrant requirements, and do as he pleased on his own authority. This is probably the lesser of two evils in his mind, since his declaration is so improper as a basis for any kind of warrant, that it is in and of itself, a Constitutional deprivation. See *Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994); "Subsequently, in *Garmon v. Lumpkin County*, 878 F.2d 1406, 1408 (11th Cir. 1989), we applied *Briggs* to a situation in which an officer sought a warrant to arrest Garmon based on an affidavit stating that Garmon "did . . . commit the offense of false report of a crime." We held that the officer had violated the Constitution by seeking the warrant, because "[s]uch a conclusory affidavit clearly is insufficient to establish probable cause. The affidavit contains neither information providing the basis for the affiant's belief nor any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime." *Id.* at 1408-09 (citation omitted).

[16] Moreover, these allegedly undisputed and conclusionary "facts" were only able to be presented by Puckett because of the failure by the HCSD to give Plaintiff herself any notice of the right to, or an actual opportunity for any, of the hearings she was entitled to by due process under *Memphis*, et al concerning contesting the allegations of each of the notices Puckett stated he sent to her by email, and "taping them to the fence" of Plaintiff's property (prior to the termination of water service). Provision of due process by the HCSD in that regard would have given Plaintiff opportunity to collect evidence and witnesses to meet those allegations, and to create a proper administrative record of proceedings demonstrating how Puckett's claims were false, and/or Constitutionally infirm.

Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 13

sheriff's department was called out <u>and after she refused to comply with the sheriff's request and</u> <u>remove the obstruction</u>, the vehicles obstructing the meter were towed away and her water was disconnected and meter removed." (ECF #26, p.3:15-21.)

3) "<u>In addition to utilizing motor vehicles to block her meter from being read, Ms. Olson</u> <u>poured kitty litter over it and placed a board over it</u>." (ECF #26, p.3:11-13.)

These statements are provably false because Puckett thereafter testified to this Court that on the occasions of the sheriff's department coming to meet with Puckett at Plaintiff's residence for the purpose of towing vehicles and removing Plaintiff's water meter, even when the officer used a "bull horn trying to get somebody to come out" that "nobody would come out". (ECF #36, p.29:10-12.) Puckett further clarified that at the time, <u>he actually had no personal knowledge</u> of if anyone was inside of Plaintiff's residence at all. The truth was therefore that Olson was *not* present. (ECF #36, pp.29:22 - 30:10. See also ECF #41, pp.2:7 - 3:5; #42, p.2:14-18.)

Clearly it is impossible for Plaintiff to have actually "refused" anything if she was not present at the scene[17]. Similarly, since she was not physically present and interacting with of those persons, it would be impossible for either Puckett, Dingman, "the District", or the police to "request" anything of Plaintiff, or for Plaintiff to have anything "explained" to her by any of them.

Furthermore, since Puckett thus admitted under oath that Plaintiff Olson was <u>not</u> actually present during any time when he and the police were in the driveway of Plaintiff's home, he is also admitting that he did <u>not</u> observe, and also <u>had no personal knowledge of if</u>, Plaintiff had "poured kitty litter" on her meter, "put a board over it", "parked" any car "on top of the meter"[18], or was "utilizing" any vehicles to "block her meter from being read" when he created that declaration, and/or when he submitted it to the Court.

---

[17] It is worth noting that Puckett's Declaration containing these false statements (ECF #26) was actually prepared by Counsel at Puckett's instruction, who then also repeated these falsehoods - particularly the part about Plaintiff's alleged "refusal" - to the Court as "representations" during the hearing. (ECF #36, pp.8-15.) It is reasonable to infer that this was Puckett's intention, since he made no effort whatsoever at any time to correct Counsel. The most egregious of these outright fabrications by Counsel Donald to this Court was made in response to the Court's inquiry at ECF #36, p.15:20-22, which was; "Was there any communication from Ms. Olson in response to any of these notices that you've produced?" Whereupon Counsel Donald replied; "Yes. She refused to remove she refused to move the obstruction. That was her response." The truth was, and known to both Puckett and Counsel Donald at the time, that there had been **no** "communication" from Plaintiff to the HCSD and/or Puckett at all, there was none during the time Puckett, Dingman, and the sheriff's officers were in front of Plaintiff's home, and that Olson had never "refused" to do anything. C.f., ECF #36, pp.9:14-17, 29:7-12, 30:8-10; ECF #41, pp.2-3.
[18] In fact, Puckett used the opportunity of the TRO hearing to *ask* Olson <u>if she had</u> parked a car over the meter. (ECF #36, p.32:19.)

Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 14

1    Although the above items were the most misleading concerning the facts of the

2  termination of water service and due process afforded (or not) to Plaintiff, the HCSD with, by,

3  and through President Puckett submitted another Declaration, identified as ECF #17-5, which

   contained the following false statement (as underlined):

4
       "Plaintiff, Kimberly R. Olson, was a former district board member of HCSD who
5      misappropriated District funds totaling approximately $61,555.00 during her term as an
       elected district board member." (ECF #17-5, pp1-2.)

6
       Misappropriation of public funds is a felony crime in California pursuant to Penal Code
7
   §424, which provides:

8
       "(a) Each officer of this state, or of any county, city, town, or district of this state, and
9      every other person charged with the receipt, safekeeping, transfer, or disbursement of
       public moneys, who either:

10
       1. Without authority of law, appropriates the same, or any portion thereof, to his or her
11     own use, or to the use of another; or,

12     2. Loans the same or any portion thereof; makes any profit out of, or uses the same for
       any purpose not authorized by law; or,

13
       3. Knowingly keeps any false account, or makes any false entry or erasure in any account
14     of or relating to the same; or,

15     4. Fraudulently alters, falsifies, conceals, destroys, or obliterates any account; or,

16     5. Willfully refuses or omits to pay over, on demand, any public moneys in his or her
17     hands, upon the presentation of a draft, order, or warrant drawn upon these moneys by
       competent authority; or,

18
       6. Willfully omits to transfer the same, when transfer is required by law; or,
19
       7. Willfully omits or refuses to pay over to any officer or person authorized by law to
20     receive the same, any money received by him or her under any duty imposed by law so to
       pay over the same;—
21
       Is punishable by imprisonment in the state prison for two, three, or four years, and is
22     disqualified from holding any office in this state.

23
       (b) As used in this section, "public moneys" includes the proceeds derived from the sale
24     of bonds or other evidence or indebtedness authorized by the legislative body of any city,
       county, district, or public agency.

25
       (c) This section does not apply to the incidental and minimal use of public resources
       authorized by Section 8314 of the Government Code." (Penal Code §424.)

The truth, which was known to Puckett (and each of the other Board Members who submitted similar statements, see ECF #17-3 and #17-4), is that Plaintiff did not, and has never even stood <u>accused</u> of Misappropriation of Public Funds - much less suffered any conviction therefore. Moreover, all of these Declarants knew at the time that they made the false statements, that the civil suit by the HCSD against Plaintiff, making similar allegations, had been voluntarily dismissed by them many months prior. (ECF #21, Exhibits A-C.) There was no reasonable basis for the HCSD and Puckett to believe that the false assertion of Plaintiff Olson having "misappropriated District funds" was true at the time the Declaration was made, and that such scandalous[19] material had no relation to the issues currently before the Court. Therefore, this Court should construe such knowingly false declarations as being deliberately calculated to embarrass, harass, and annoy Plaintiff, while attempting to distract from the legal issues, and to inflame the passions of the Court against her.

The introduction of false testimony by the government is a violation of due process. See *Jackson v. Brown*, 513 F.3d 1057, 1076 n.12 (9th Cir. 2008) (noting that "the prosecution's knowing use of perjured testimony will be more likely to affect our confidence in the jury's decision, and hence more likely to violate due process, than will a failure to disclose evidence favorable to the defendant"). "The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost"); *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (noting that "[t]he Supreme Court has long emphasized 'the special role played by the American prosecutor in the search for truth'" (quoting *Strickler v. Green*, 527 U.S. 263, 281 (1999)) and that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment")

Additional concerns arise when the government knowingly countenances false testimony. The government's willingness to do so signals lack of concern with the fairness of the process (as does the failure to provide any pre-deprivation hearings) and, further, suggests that it is compensating for a weak case - and raises the additional concern that it may have allowed other falsities to go uncorrected, or withheld other favorable evidence. In this case, the false evidence produced to this Court outlined above was also prejudicial, as that false testimony convinced the

---

[19] "'Scandalous' matter is that which improperly casts a derogatory light on someone, most typically on a party to the action.") (footnote omitted); 2 Moore's Federal Practice § 12.37[3] at 12-97 ("'Scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.") (footnote omitted).

of the court.") (footnote omitted).

Court that <u>Plaintiff herself</u> had affirmatively refused to comply with the various notices and "violations" alleged by Puckett, instructions/requests of the sheriff's department, and that she had placed a vehicle on her water meter and <u>willfully refused</u> to remove it.  (ECF #29, pp.3, 17, 22, 25; #36, pp.15:20-22, 18:24-26.)

Plaintiff is thus entitled to a determination and judgment in her favor, and against these Defendants, on this claim as to these specific facts.

**<u>Federal Count IIIa - Deprivation(s) of Due Process by HCSD, Puckett, and Dingman Concerning the Contents of any "Notice"[20], and Failure to Provide any "Hearing" Prior to Terminating Plaintiff's Water Service as Required by the Supreme Court in *Memphis*, et al</u>**

1.  Summary of Issues and Facts For Which Plaintiff Seeks Summary Judgment on This Claim.

To succeed on her 42 U.S.C. §1983 claim, grounded in the Fourteenth Amendment Due Process Clause, Plaintiff must prove by a preponderance of the evidence: (1) the deprivation of a property (or liberty)  right "secured by the Constitution and the laws" of the United States; and (2) that Defendants deprived her of that right while acting under color of state law. See *Flagg Bros.,Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

There is no dispute that the HCSD is an entity of local government, operating as a Special District that provides water to the community of Hornbrook, California, and to Plaintiff's home, while Defendants Puckett and Dingman are officers and employees of the HCSD, so were acting "under color of state law" at all times while: issuing "notices" alleging various "violations"; being present at Plaintiff's home and driveway; ordering the sheriff's department to tow vehicles; terminating Plaintiff's water service; seizing Plaintiff's water meter; and, placing locks on her privately-owned piping to her house.  (ECF #17-1, p.1; #17-5, p.1; #26, #36, pp.18-19; #41, pp.2-3; #44, pp.2-3.)

There is also no dispute that Plaintiff has a vested property right in her water service that is a recognized property right "secured by the Constitution and the laws" of the United States. See this Court's findings at ECF #29, p.16:9-15:

> "The HCSD's authority to disconnect service is circumscribed. See Cal. Health & Safety Code §116908; Perez, 27 Cal. 3d at 894; see also ECF No. 3, pg. 7 (describing HCSD's policies on disconnection of service); ECF No. 26, pgs. 12-15 (Ex. C) and 21

---

[20] Without waiving any claims she may have in regards thereto (ECF #44), Plaintiff does **not** at this time seek any Court determination or judgment as to the issue of if the <u>method of delivery</u> of each and all of the "notices" by the HCSD, Puckett, and/or Dingman (by email and/or "taping to the fence/gate" of Plaintiff's property) did or did not constitute a Constitutional violation of Due Process. *Greene v. Lindsey*, 456 U.S. 444, 455-456 (1982)).

(Ex. F). Indeed, termination of a utility may only be for cause. See Perez, 27 Cal. 3d at 894. Olson thus had a protected property interest in continued water service. See Autotek, 2020 WL 4059564, at *17. And because she had a property interest, Plaintiff had a right to due process. See Memphis, 436 U.S. at 10–12; Wright, 981 F.3d at 727; Autotek, 2020 WL 4059564, at *17–18. "

Plaintiff alleges that Puckett, Dingman, and HCSD, during times material to FAC, failed to provide her Constitutionally **adequate** notices concerning allegations against her of "violations" concerning her water service on four (4) occasions prior to their termination of Plaintiff's water service to her home in July of 2021. (ECF #26, pp.16-21, Exhibits D-G; #36, pp.11-15, 17, 19, 26, 28, 31, 32.) That is, any other considerations aside, Plaintiff's allegations in this regard is that the actual **content** of each and all of those purported notices failed to meet the requirements of due process relating to termination of Plaintiff's water service as specified in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 12-16 (1978) by:

　　　1) Not informing Plaintiff of any pending hearing concerning the subjects of any notice;

　　　2) Not in forming Plaintiff of any means to request a hearing regarding any notice;

　　　3) Not informing Plaintiff of the name and contact information of an employee of the HCSD empowered to answer questions, or otherwise address Plaintiff's concerns about any notice, and/or any "violation" alleged against her; and,

　　　4) Not informing Plaintiff of any other means to contest the "violations" and any other statements contained in the notices.

Plaintiff also alleges that these same Defendants additionally violated Plaintiff's Due Process rights because they also **failed to actually *provide*** any pre-deprivation hearing(s) at which Plaintiff might have appeared to present her own evidence and witnesses to contest the allegations and any evidence against her of "violations" as contained in each (or any) of those four notices prior to the Defendants' disconnection of Plaintiff's water service to her home in July, 2021. Puckett's Declaration, and Puckett's testimony before this Court under oath, make clear that hearings, or other opportunity to contest alleged "violations", are not part of the process used by him and the HCSD in terminating water service, and there is no effort made to provide any such hearings. ECF #26, pp.3:15-21, 16-25; #29, pp.11:18-22; #36, pp.19, 26-31.

In addition, these Defendant's actual **imposition of punishment** against Plaintiff, in the form of seizing her water meter from her driveway and terminating her water service to her home absent any Constitutionally adequate notice per *Memphis*, **and** without any pre-deprivation hearings relating to termination of Plaintiff's water service, further and additionally deprived Plaintiff of her rights to due process, so each of those events individually constituted an

1   additional instance of the violation of Plaintiff's Due Process rights which formed the basis for an
2   unconstitutional deprivation of Plaintiff's property right/interest in the water service to her home.

3

4   2. Defendants HCSD, Puckett, and Dingman Have Deprived Plaintiff of Property and "Property
    Interests" Without Due Process of Law, in Violation of the 14th Amendment to the United States
5   Constitution by Failing to Provide her **Constitutionally Adequate** Notice(s) That Provide
6   Information About a Hearing, or How to Request a Hearing, **and**, by Failing to **Give** Plaintiff
7   any Hearing, **Prior** to Terminating her Water Service, as to the Allegations Contained in Each
    and/or any of the Notices Created by the HCSD and Puckett in July of 2021.
8
          The U.S. Supreme Court, in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.
9   306 (1950), states the familiar standard for procedural due process: "An elementary and
10  fundamental requirement of due process in any proceeding which is to be accorded finality is
11  notice reasonably calculated, under all the circumstances, to appraise interested parties of the
    pendency of the action and afford them an opportunity to present their objections." (Emphasis
12  added.) These dual rights to notice and an opportunity to be heard must **both** be granted at a
13  meaningful time and in a meaningful manner **prior** to any deprivation of a property interest.

14        Thus, in order to meet the requirements of essential principles of due process, these
15  Defendants, before undertaking any deprivation of life, liberty, or property, must assure that their
16  actions against Plaintiff "be preceded by notice and opportunity for hearing appropriate to the
    nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)
17  (emphasis added). The Supreme Court has described this "root requirement" of the Due Process
18  Clause as being "that an individual be given an opportunity for a hearing **before** he is deprived of
19  any significant property interest." 7 *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis
20  added). It is undisputed on the record presently before the Court that Plaintiff was not granted
    any hearing before her water service was terminated. (ECF #3, pp.5:3-9, 7:8-20; #26, #36, pp.8-
21  15, 18-21, 26-32; #29, pp.11:18-22, 15; #42, p.4:15-21., #44, pp. 5 at fn13, 7:1-4, 11:7-9, 15:20-
22  21, 18:18-22, 19:15-19.)

23        In the case of *Memphis Light, Gas & Water Div. v. Craft, supra*, 436 U.S. 1, the United
24  States Supreme Court held that when state law precludes the termination of utility service other
    than for good cause, there arises" a 'legitimate claim of entitlement' within the protection of the
25  Due Process Clause" (*id*., at pp. 11-12) requiring that a constitutionally adequate notice **and**
    hearing procedure be afforded prior to termination of utility service in order "to afford
    reasonable assurance against erroneous or arbitrary withholding of essential services" (*id*., at p.

18). The form of notice required in such cases is one which is "'reasonably calculated' to inform [customers] of the availability of 'an opportunity to present their objections' " (*id.*, at p. 14); the necessary hearing is one which provides "an opportunity for the presentation to a designated employee of a customer's complaint" (*id.*, at p. 16, fn. omitted). The availability of a remedy by way of injunction is not "an adequate substitute for a pretermination review". (*Id.*, at p. 20.)

In fact, in this instance, there was not even any indication on the "notices" purportedly delivered to Plaintiff by email and "taping to the fence/gate" as to who may have issued them, since it was the "custom and practice" of the HCSD and President Puckett to not sign or date them. ECF #26, pp.16-21, Exhibits D-G, #36, pp.15:7-11, 26:15-21.) Such unsigned, undated "notices" do not meet the requirements of a constitutionally-adequate notice pursuant to the requirements of the Supreme Court in *Memphis* because instead of providing information about a "hearing", how to obtain one, and/or the name and contact information of a responsible employee of the agency[21], such a "notice" actually functions to **conceal** critical information that a water customer would require to seek to contest the allegations of the "notice".

Because California law does not permit the termination of utility service to a customer without good cause (*Schultz v. Town of Lakeport* (1936) 5 Cal. 2d 377, 381-382), the requirements set forth in the *Memphis* case are fully applicable here to the HCSD, and its officers, Puckett and Dingman.

The notice given by a utility provider concerning any intent to, or basis for, termination of service must be reasonably calculated to apprise all interested parties of the impending action and afford them an opportunity to present their objections. See *Memphis, supra*; see also *Mullane, supra*, 339 U.S. at 314.

While due process requirements are flexible with the circumstances, the opportunity to be heard concerning objections, or to contest accusations in a notice, **must** be provided at a meaningful time and in a meaningful manner - or there simply is no "due process" provided at all. See *Gilbert v. Homar*, 520 U.S. 924, 930–31 (1997); *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017); c.f., *Memphis, supra*, 436 U.S. 1, at 16-19. In this case, the HCSD and Puckett failed to provide any hearing (or opportunity for a hearing[22]) at all prior to terminating Plaintiff's water service. (ECF #3, pp.5:3-9, 7:8-20; #26, #36, pp.8-15, 18-21, 26-32; #42, p.4:15-21; #44

---

[21] See *Memphis, supra*, 436 U.S. at 12-16.
[22] Indeed, Plaintiff actually sent a letter to the HCSD and Puckett requesting such a hearing, but was ignored. (ECF #3, pp.3:2-10, 9-13; #4, p.2:8-13; #44, p.4:15-19.)

1  [repeated references throughout the FAC to Plaintiff not being given any "hearing(s)" prior to

2  termination of water service throughout].)

3        In the context of utility services, a vested property interest exists if a plaintiff can

4  establish a "legitimate claim" to continued service[23]. See *Memphis Light, Gas & Water*, 436

5  U.S. at 9–12; *Autotek, Inc. v. County of Sacramento*, No. 2:16-cv-01093-KJM-CKD, 2020 WL

6  4059564, at *17 (E.D. Cal. July 20, 2020). The extent of that right is defined and shaped by state

7  and local law. See *Memphis*, 436 U.S. at 11–12; *Parks v. Watson*, 716 F.2d 646, 656 (9th Cir.

8  1983); *Autotek*, 2020 WL 4059564, at *17. Nevertheless, where state and local rules limit public

9  utilities' power to discontinue service, customers of that utility have a protected interest in

10  continued service. See *Memphis*, 436 U.S. at 11–12; *Autotek*, 2020 WL 4059564, at *17.

11        Included in the record herein are several notices purportedly delivered by email and

12  "taping" them to the gate and fence around Plaintiff's property by Defendant Puckett acting as

13  HCSD President. (ECF #26, pp.2-3, and 16-23). The notice provides only the information that

14  Plaintiff stands accused/convicted[24] by the issuer of a "violation", which is vaguely described in

15  the notice. None of the notices are signed, and there is no indication who issued it. There is no

16  information about any hearing being set to contest the "violation", and there is no information

17  provided to allow Plaintiff to request that a hearing be provided to her in order that she might

18  contest the "violation". It is clear that these documents, neither individually nor collectively,

19  provide the Constitutionally-adequate sort of "notice" analyzed and **required** by *Memphis*,

20  because each and every one of them "was not 'reasonably calculated' to inform [Plaintiff] of the

21  availability of 'an opportunity to present [her] objections'" to the allegations of the notice, and/or

22  the proposed action of the HCSD/Puckett. (*Memphis, supra*, 436 U.S. at p. 14.)

23        It also does not appear that HCSD procedures at the time of the termination here in

24  question even provided any specific channel for pretermination review with a designated

25  employee empowered to resolve such disputes of a disputed "violation" or "notice" that threatens

   a customer with termination of water service - or that the HCSD even has any such person. In

   this respect as well, then, the HCSD/Puckett's procedures fell short of those required by the

   *Memphis* case - and continue to do so.

---

[23] There is no dispute on this issue, as the Court has already found it applies. (ECF #29, pp.15:10 - 16:15.)
[24] This is demonstrated by the use of determinative language such as; "You are in violation..."; "As a result of your violation..."; "You will be held liable...". (ECF #26, pp.17, 19, 21.)

3.  Defendants Failed to Provide Plaintiff **any** Opportunity for a Hearing to Confront and Rebut Allegations and Evidence Against her **Before** Terminating her Water Service.

The "notices" created, and directed to Plaintiff Olson by the HCSD and Defendant Puckett make clear that the "violations" listed therein are not just allegations - they have already been conclusively determined against Plaintiff by the issuer (see fn11, below).  Thus, in addition to failing to provide any information concerning an impending hearing, or the means to request a hearing to contest the allegations prior to their determination against a customer, the "notices" also deprive a customer of any way to appeal the adverse conclusion(s) of the issuer.  (ECF #26, pp.3, and 16-25.)

On September 14, 2021, Defendant Puckett testified to this Court to the process of termination of Plaintiff's water service undertaken by him.  This testimony makes clear that he did not, as part of that process, afford Plaintiff any hearing at which to confront or rebut the allegations against her in the "notices" prior to the deprivation of her water service.  (ECF #26, pp.1-4, and16-25; ECF #36, pp.18-21, 26-32.)  Indeed, when confronted over his failure to follow even the existing policies and procedures of the HCSD concerning timeframes between notices and action[25], and the installation of a "flow restrictor" prior to terminating water service, Puckett claimed that he disregarded those procedures, and decided to remove Plaintiff's water meter immediately, due to "so many violations"[26].  (ECF #36, pp.19, 28-31.)

Due process requires the government to provide "some kind of hearing . . . at some time" when it deprives a person of a protected property interest. See *Memphis, supra,* 436 U.S. 1, at p.16.  "There have been cases in which the Supreme Court has found that a post -deprivation hearing suffices, but under no circumstances has the Supreme Court permitted a state to deprive a person of a life, liberty, or property interest under the Due Process Clause without any hearing whatsoever." *De Nieva v. Reyes,* 966 F.2d 480, 485 (9th Cir. 1992) (emphasis supplied) (internal citation omitted) .

Essential to the "hearing requirement" prong of Due Process is the provision of at least some opportunity to confront and respond to the government's allegations and evidence. *American -Arab Anti-Discrimination Comm. v. Reno,* 70 F.3d 1045, 1069 (9th Cir. 1995) (due process hearing requirement has "ancient roots" in rights to confrontation and cross examination)

---

[25] See, i.e., HCSD Rules and Regulations, ECF #34, at Section 4.03.
[26] There is no indication in the HCSD Rules and Regulations whatsoever that the number of violations can reach a point where any of the provisions concerning notice as found in Sections 2.10, 4.03, and 4.15 suddenly become inapplicable to a customer, or discretionary to any HCSD officer.

(citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).  The hearing must permit the plaintiff "to prove or disprove" the facts that are "relevant" to the deprivation.  *Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1, 7 (2003).

The HCSD, by and through its President, Defendant Puckett, failed at all times (and continues to fail) to provide Plaintiff any type of hearing; written or in-person, pre- or post - deprivation, where she could confront or rebut the allegations, and/or any evidence supporting the allegations, in the "notices".  The notices, and Puckett's testimony to this Court, show that factual findings necessarily underlie the allegations in the notices, and inform the determinations of actions taken by Puckett (i.e., allegedly Plaintiff "got so many violations" that he couldn't wait, couldn't install a flow restrictor, so had to immediately pull the meter instead, etc).  (ECF #26, pp.16-25; ECF #36, pp.19, 29-30.)

Defendants cannot square their use of the secret and one-sided process utilized here by Puckett with governing due process doctrine.  Specifically on all fours with this case, the Supreme Court has held that due process requires in -person hearings permitting confrontation and rebuttal.  See, e.g., *Memphis, supra*, 436 U.S. at 16 (in-person hearing required prior to termination of utilities); see also *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979)  (same for recovery of excess Social Security payments);  *Goldberg v. Kelly*, 397 U.S. at 26 (same prior to termination of welfare benefits); *Goss v. Lopez*, 419 U.S. 565, 581 (1975) (same prior to temporary school suspension).  While "limited" situations may justify providing a post - deprivation, rather than pre -deprivation hearing, clearly established Ninth Circuit law prohibits Defendants from categorically refusing to provide Plaintiff any hearing(s) **at all**.  *FDIC v. Mallen*, 486 U.S. 230, 240-241 (1988); see *De Nieva* v. Reyes, 966 F.2d 480, 486 (9th Cir. 1992)  ("right to a hearing was clearly established").

Defendants' failure to afford Plaintiff any hearing compounds this error because she was (and is) prevented from presenting exculpatory information and challenging the credibility and strength of Defendants' evidence before an impartial decisionmaker, and for the purpose of making a proper record for later judicial review.  See *De Nieva*, 1989 WL 158912, at *7; *Califano v. Yamasaki*, 442 U.S. 682, 697 (1979)(in-person hearing necessary to assess character, credibility, and good faith).

**Monell Liability of the HCSD for Actions of Puckett and Dingman**

In making out this claim, Plaintiff incorporates, as if fully set forth at this point, the forgoing sections of this Motion, as set forth on pages 2 through 23, as well as the citations to the record of this Court, and to undisputed facts, found therein.

There is no dispute that the HCSD is a political subdivision of the State of California, existing as a Special District local governmental entity that supplies water to the community of Hornbrook, California, and that Defendants Puckett and Dingman are officers of the HCSD.

**A. These Defendants Were at All Relevant Times "Persons" Acting Under Color of State Law.**

Local municipal governments are "persons" pursuant to 42 USC §1983. See generally, *Monell v. New York City Department of Social Services*, 436 U.S. 654 (1978) ("*Monell*"). A defendant is "acting under color of state law " when that defendant has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. '" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941) ); see also, *Polk County v. Dodson*, 454 U.S. 312, 317-318 (1981) . " In such circumstances, the defendant's alleged infringement of the plaintiff's federal rights is "attributable to the State.'" *Atkins*, 487 U.S. at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ).

Here, it is beyond dispute that Defendants Dingman, and HCSD President Puckett, were acting in their official capacities, and under color of state law when they deprived Plaintiff of her federal Constitutional rights as described in the foregoing sections. (ECF #17-1, p.1; #17-5, p.1; #22, #26, #36, pp.18:2-7, 19-20, 26:15-21, 28:1-13; #41, pp.2-3; #42, #44, pp.2-7.)

The uniformed, on -duty law enforcement personnel, summoned to Plaintiff's home by Puckett and Dingman to "tow cars", use a "bullhorn", interrogate Plaintiff's neighbors, and take other actions at their instruction, were thereby acting as *de facto* agents of the HCSD, Puckett, and Dingman, while also irrefutably acting under color of State law. *Griffin v. Maryland*, 378 U.S. 130, 135 (1964) . (ECF #26, p.3; #36, pp.9:17, 19:17-21, 29:9-12; #41.)

*Monell* holds that municipal governments may be sued for damages, as well as declaratory and injunctive relief, whenever "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover. . . local governments . . . may be sued for

1    constitutional deprivations visited pursuant to governmental 'custom ' even though such a

2    custom has not received formal approval through the body's decision making channels." *Monell*,

3    436 U.S. at 690 -91.

> An individual 's conduct implements official policy or practice under several types of
> circumstances, including when (1) the individual acted pursuant to a formal government
> policy or a standard operating procedure long accepted within the government entity, (2)
> the individual himself has final policy - making authority such that his conduct represents
> official policy, or (3) a final policy-maker renders the individual's conduct official for
> liability purposes by having delegated to him authority to act or speak for the
> government, or by ratifying the conduct or speech after it has occurred.
>
> [Hill v. Borough of Kutztown, 455 F.3d 225, 245 (3d Cir. 2006) (citing Pembaur v. City
> of Cincinnati, 475 U.S. 469, 478-484 (1986); McGreevy v. Stroup, 413 F.3d 359, 367
> (3d Cir. 2005); and Laverdure v. County of Montgomery, 324 F.3d 123, 125-126 (3d Cir.
> 2003)).]

11   The Supreme Court has explained what constitutes an "official policy " as follows:

> "[O]fficial policy " often refers to formal rules or understandings -- often but not always
> committed to writing -- that are intended to, and do, establish fixed plans of action to be
> followed under similar circumstances consistently and over time. That was the case in
> Monell itself, which involved a written rule requiring pregnant employees to take unpaid
> leaves of absence before such leaves were medically necessary. However, as in Owen and
> Newport, a government frequently chooses a course of action tailored to a particular
> situation and not intended to control decisions in later situations. If the decision to adopt
> that particular course of action is properly made by that government's authorized
> decisionmakers, it surely represents an act of official government "policy" as that term is
> commonly understood. More importantly, where action is directed by those who establish
> governmental policy, the municipality is equally responsible whether that action is to be
> taken only once or to be taken repeatedly. To deny compensation to the victim [of such a
> policy] would therefore be contrary to the fundamental purpose of §1983.
>
> [*Pembaur*, 475 U.S. at 480 -81 (1986) (referencing *Monell*, 436 U.S. 658;  *Owen v. City
> of Independence*, 445 U.S. 622 (1980); and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247
> (1981) ).]

22       "Where plaintiffs allege that their rights were deprived ... by the unconstitutional

23   application of a valid policy, or by a city employee's single tortious decision or course of action,

     the inquiry focuses on whether the actions of the employee in question may be said to represent

24   the conscious choices of the municipality itself." *Amnesty America v. Town of W. Hartford*, 361

25   F.3d 113, 126 (2d Cir. 2004). "Such an action constitutes the act of the municipality and

     therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of

     the city 's authorized policymakers. " *Ibid.* (citing *Pembaur*, 475 U.S. at 481-82). "Thus, even

a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered,' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty America*, 361 F.3d at 126 (quoting *Pembaur*, 475 U.S. at 481-82).

Thus, a municipality may be held liable for the actions of its employees when "the policymakers make a deliberate choice from among various alternatives to follow a particular course of action, where the policy reflected deliberate indifference to the constitutional rights of the municipality inhabitants and where the policy was the moving force behind a constitutional violation. " *Mark v. Borough of Hatboro*, 51 F.2d 1137, 1149 (3d. Cir.), cert. denied, 516 U.S. 858 (1995). Therefore, liability must attach when the "' execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Id.* (quoting *Monell*, 436 U.S. at 694).

In this case, these Defendants have represented to the Court, and Defendant Puckett has further testified, that he is the President of the HCSD (ECF #17-5, p.1), and that he sent various notices of "violations", containing citations to HCSD Resolutions, Rules and Regulations, and California State laws, to Plaintiff Kimberly R. Olson <u>exclusively</u> via email, and by "taping them to the fence/gate" surrounding her home and property (ECF #26, pp.16-25, Exhibits D-G; ECF #36, pp.9:10-13, 9:19-22, 15:1-19, 18:1-7, 26:15 - 27:25, 28:10-18.

Defendant Puckett further testified to this Court that Plaintiff's meter[27] was removed by the HCSD, Puckett, and Dingman (and so Plaintiff's water service thus terminated) because Plaintiff had been given "several warnings" and Puckett allegedly "had to have the Sheriff out there two times to tow vehicles". Puckett did not testify as to any basis in law, or the HCSD

---

[27] As the government agency that seized Plaintiff's water meter without any hearing or warrant, and that seizure is therefore *per se* unreasonable under the 4th Amendment, <u>the HCSD and Puckett</u> must prove that the HCSD actually had the right to make that seizure. Puckett simply stating "[t]he District owns all the meters from my understanding" (ECF #36, p.16:2-3), along with the representations by him and his Counsel that the basis for ownership (despite the fact that Plaintiff purchased the meter at issue) is merely the "rules and regulations" and/or the "policies and procedures" of the HCSD (ECF #36, p.16), does not circumvent the fact of ownership of the meter by Plaintiff, nor the requirement that if the HCSD wants to take ownership, and make public use, of a water meter that Plaintiff paid for and had installed at her own expense (ECF #4, p.1), then it would need to comply with the Takings Clause of the Fifth Amendment (and only after proper notice and hearing) by providing just compensation for the value of that meter. Puckett and the HCSD cannot lawfully declare their ownership of that meter by fiat, and their attempt to do so is another example of their policy and custom of simply disregarding Constitutional requirements, and specifically the Constitutional Rights of Plaintiff, in their operations.

Rules and Regulations, for his purported authority to "tow vehicles" from Plaintiff's property[28] without a warrant - particularly just on a whim so that he could read the meter at random intervals <u>outside</u> of the normal meter-reading period of the 25th-30th of the month (ECF #4, p.2:22-23; HCSD Rules and Regulations, ECF #34, Section 12.07).  He also did not testify as to any lawful authority by which he could seize Plaintiff's water service, and/or water meter without any pre-seizure hearing, nor warrant.  Puckett did, however, submit to the Court (see Puckett Declaration, ECF #26, p.25) a document he testified was part of a "notice" he sent by email to Plaintiff, which purportedly cites to HCSD Rules and Regulations §4.11 as the basis for a "violation" consisting of "**obstructing and tampering with a district water meter** in violation of District Rule 4.11 and 4.11" (emphasis and redundancy in original).  The same document, in ¶2 claims in part that; "Parking a vehicle over a district water meter and willfully refusing to move it so the district can read the meter is a violation of District Rule 4.11."[29]

The actual text of HCSD Rule 4.11, however, is as follows:

"4.11 **Tampering with District Property** - Except as otherwise specifically authorized by the General Manager, no one, except an employee or representative of the District, shall at any time in any manner operate the curb cocks or valves, main cocks, gates or valves of the District's system; or interface with meters or their connections, street main or other parts of the water system."

---

[28] Puckett stated under oath that he merely "believe[d]" that the meter was on property owned by the County because it was "outside the fence" surrounding Plaintiff's yard and home.  This "belief" is not admissible evidence supporting any claim of right of access by the HCSD and Puckett to private property absent a warrant - particularly when vehicles are <u>also</u> ordered towed by them from that private property (again, absent any warrant) simply in order to read a water meter.  Since the HCSD is not "the County" anyway, it would have no right of possession or control over any County-owned property such that it could order vehicles towed therefrom.  In contrast, Plaintiff, who has personal knowledge of the location of her property lines, has stated that the vehicles, the meter box, and the meter, were all located on her property at the time of the events described in the FAC.  (ECF #1, pp. 3:1-3, 4:11-16, 4:22-25, 5:1-6, ; #3, p.4, #4., pp.2:20 - 3:2; #36, p.20:16-24; #44, pp.5:2 - 6:9, 18:5-8, 19:10-13.)

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, (1984).  Besides a direct possessory interest in the personal property of her water meter and meter box, Plaintiff clearly has possessory interests in the real property that she owns -inclusive of the right to grant permission to people to park in her driveway without fear of arbitrary and capricious seizures of the vehicles and other property of her guests by Puckett, the HCSD, and/or the police - particularly acting without a warrant.

[29] And here, it is worth noting that not only is Plaintiff denied any opportunity for hearing to contest the allegations of any "notice" concerning an alleged "violation", but that the same individual issuing the accusatory "notices" is <u>also</u> the one making final decisions about the facts at issue, as well as the interpretation and application of the Districts Rules and Regulations.  This is yet another component of the policy, custom, and practice of Puckett and the HCSD of routinely violating Due Process rights, in that in the case of allegations of "violations" against a customer, those allegations (and objections, evidence, etc) are not reviewed by a neutral decisionmaker.

1

2          As is readily apparent, there is actually no mention whatsoever of "obstructing" a "district

water meter" in this Rule[30], nor is there any authority purportedly granted therein whereby

3      Puckett and the HCSD may tow away a vehicle that they claim is "obstructing" access to the

meter. Nor, in this instance, is there any factual basis, nor any substantial evidence[31], that would

4      lead a reasonable person to conclude the meter at Plaintiff's home was/is in fact a "district water

5      meter", so Puckett's assumptions and actions are completely arbitrary and capricious in that

6      regard as well - particularly when he knew Plaintiff has asserted her ownership of the meter.

7      (ECF #3, p.8:1-3; #4, p.1; #36, 16:4-17[32].)

          Moreover, the only mention in the HCSD's Rules and Regulations of anything like

8      "obstructing" a meter is found at Section 4.29, entitled "**Access to Meters**", and states, in

9      essence, that if employees of the district cannot get to the meter to read it, then charges will be

10     billed to the customer based upon estimate until such time as the meter may be accurately read.

11     At no point does this section even purport grant any authority to anyone to forcibly seize or

12     remove property of any sort - including vehicles (and it would violate the 4th and 14th

Amendments if it did, anyway).

13         According to Puckett's testimony concerning the process and procedures by which he

14     seized Plaintiff's water meter, and terminated her water service to her home, no **hearing** as to any

15     of the alleged "violations" contained in any of the notices was provided to Plaintiff Olson (or

16     anyone else) prior to the towing/seizure of vehicles from Plaintiff's driveway, termination of the

water service, and the seizure of Plaintiff's water meter (all without any warrant or court order).

17

18

_____

19     [30] It is also abundantly clear that Puckett confuses and conflates "obstruction" of the water meter itself
       with obstructing mere **access** to that water meter for reading purposes.

20     [31] Puckett did not include in his declaration, nor testimony to the Court, and information that would lead
       any reasonable person to the conclusion that he has any personal knowledge as to the origin of Plaintiff's

21     water meter, and/or as to its installation, at all.

22     [32] Despite Counsel's claims at this point, there is in fact no statute, nor any "rules and regulations", that
       would override the Takings Clause of the 5th Amendment to automatically grant ownership of Plaintiff's

23     driveway area, meter box, or water meter to the HCSD, and he cites to none. In fact, the Rules and
       Regulations of 2013 which are now in effect only provide that property which belongs to the District

24     initially, and which is installed on a customer's property "shall remain the property of the District"
       (Section 4.16). Since Plaintiff was obliged to purchase her own replacement water meter and meter box

25     by former HCSD President Mary Ryce (ECF #4, p.1), neither of those items have ever belonged to the
       District, and it has failed in its burden to establish otherwise in order to justify its seizure of the meter
       without a warrant, or order after hearing. Seizures of property without a warrant or determination by a
       Court are *per se* unreasonable under the Fourth Amendment, and it is the burden of the government
       agency undertaking the seizure to prove its legitimacy in every respect. See, i.e., *United States v.
       Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)

1          Puckett also, when describing under oath the process attendant to imposing consequences

2    upon HCSD customers for "violations" made clear that hearings, or other opportunity to contest

3    alleged "violations", were not part of the process used by him and the HCSD in specifically

     terminating Plaintiff's water service, and/or seizing her water meter, and that in the case of

4    Plaintiff, it was his decision, based upon "so many" "warnings" to, and alleged violations by,

5    Plaintiff, that he would skip the HCSD's normally procedurally required step of installing a flow

6    regulator prior to termination of service, and instead simply terminated Plaintiff's water service.

7    (ECF #29, pp.11:18-22, #36, pp.19:1-24, 29:2-12, 30:16-31:4.)

            Thus, it is clear that the President of the HCSD believes that he has the authority to,
8
     actually does, and did in this case in regards to his interactions with Plaintiff, rewrite, reinterpret,
9
     dictate, recklessly fail to familiarize himself with, and/or selectively ignore[33], the Rules and

10   Regulations of the HCSD "on the fly", and that those rewritten/reinterpreted Rules and

11   Regulations, and other authority/powers Puckett grants himself (e.g., the determination as to the

     form and content of "notices", and/or the sufficiency of the means of service of those "notices"),
12
     allow him to ignore the Constitution and laws of the State of California, and of the United States,
13
     in that he is able to use his position as "President of the HCSD" to order the sheriff's department

14   to tow and seize vehicles; to personally (and/or order Defendant Dingman to) seize water meters;

15   and/or, to terminate water service - all without any predeprivation hearings of any sort, without

16   any warrants, and without any opportunity for judicial review before or after his actions.

            Equally clear is that the sheriff's department personnel, and the employees of the HCSD
17
     (Dingman), regard President Puckett as the face of the HCSD, and that his commands and
18
     instructions are the policies and procedures of the entity itself - something that Puckett does not

19   in any way dispute, or take any pains to clarify to the contrary with anyone - including in his

20   testimony to this Court (ECF #36). The HCSD is therefore clearly liable to Plaintiff for the

     Constitution-violating actions of its highest decision-making officer under *Monell*.
21

22

23

24

25
     ─────────────────────────
     [33] See, i.e., HCSD Rules and Regulations at Section 4.03 requiring that any notice of a violation be
     "served", and additionally that a customer be granted "not less than two...working days" in which to
     correct alleged violations.  (ECF #36, pp.9:11-12, 26:15 - 27:23,  28:8 - 29:1, 30:11-14)

     Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 29

**Federal Count IIIb - Deprivation(s) of Due Process by HCSD, Puckett, and Dingman**

1.  The HCSD, Puckett, and Dingman Have Also Consistently Denied, and Failed to Provide, Adequate Due Process to Plaintiff Olson by Refusing and Failing to Abide by the Bylaws, the Rules and Regulations, and other Procedures of the HCSD, Which Failures Directly led to the Violation of Federally Recognized and Protected Rights Under the US Constitution.

In making out this claim, Plaintiff incorporates, as if fully set forth at this point, the forgoing sections of this Motion, as set forth on pages 2 through 29, as well as the citations to the record of this Court, and to undisputed facts, found therein.

The inconsistent, arbitrary, and unlawful treatment of Plaintiff by the HCSD and it representatives Puckett and Dingman includes but is not limited to:

a. Terminating water service or  preparing for service termination without notice being delivered to Plaintiff by those means **required** by the HCSD Rules and Regulations;  (ECF #34, Sections 2.10, 4.03, and 4.15).

b. Terminating water service without providing any opportunity for Plaintiff to contest the shutoff due to improper notices that fail to advise customers of any opportunity or means to appear at, and/or request a hearing.  (ECF #34, Sections 2.10, 4.03, and 4.15).

c. Failing to implement and observe the HCSD's own requirements regarding customers, and Plaintiff Olson in particular, concerning notice, and service of notice[34] of: regular communications of important events relating to the HCSD and/or water service; general "violations"; "waste"-related allegations and/or violations; access to meters; and, timeframes to allow "correction" of alleged violations, as set forth in the Bylaws at Section A-9(15) and Section 1-6.020, and in the Rules and Regulations at Sections 2.10, 4.03, 4.15, 4.29, 13.01, *et seq*, and 14.05 (concerning restoration of service once a customer is in compliance).

---

[34] Section 2.10 HCSD Rules and Regulations specifically require that any notice from the HCSD to a customer be provided only by either "personal delivery thereof to the person to be notified" (emphasis added), or by "U.S. Mail".  Section 4.03, and 4.15 of the Rules further mandate that notice concerning any allegations of "waste" of water (c.f., ECF #26, pp.2-3, 14-15, 19, 21, 24) shall be "served".  Per California law, Puckett's methodology of "serving" Plaintiff by email (without her permission to do so) and/or taping documents to her fence or gate do not comply with any lawful means of service, and do not comply with the plain language of Section 2.10 requiring delivery be "to the person".  The use of email to serve documents is not permitted by Section 2.10 at all, and is expressly prohibited by State law absent the written consent of the person who is to be "served" (CCP §1010.6(a)(2)(A)(i); §1010.6(a)(3)(A-B); §1010.6(d)(4); §1011(b); §1013(g) .

d. Refusing and failing to reconnect water service to Plaintiff once she came into compliance with the alleged violations which resulted in termination of her water service. (Rules and Regulations at Section.14.05.)

## Reckless Indifference to Civil Rights by Puckett and Dingman

In making out this claim, Plaintiff incorporates, as if fully set forth at this point, the forgoing sections of this Motion, as set forth on pages 2 through 29, as well as the citations to the record of this Court, and to undisputed facts, found therein. Also see ECF #4, #22, #40, #41, #42, #44.

It is very clear, looking at the totality of circumstances surrounding the actions of Puckett, and Dingman as presented in the record before the Court, that no reasonable government officials would have conducted themselves in such a way unless they simply did not care about any potential consequences for their actions - even to the point of not bothering to familiarize themselves with the HCSD's own, not-particularly-lengthy, Rules and Regulations, because they clearly are in the positions of being able to, and did: make their own rules; take actions that deviate from the Rules, re-write the Rules, single-handedly interpret the Rules (and statutory application thereto) and so forth as detailed herein.

Any sensible, rational, reasonable governmental officer would most certainly **at least** have contacted County Counsel (or their private attorneys - of which these Defendants have several) to discuss the situation, actions up to that point by both sides, and to plan what steps to take next while minimizing risk of liability.

And yet, Defendant and HCSD President Puckett's declarations and testimony to this Court make clear that such a thought never even crossed his mind - a perception reinforced by the wording of the "notices", which do not even contain the normal fig leaf words such as "alleged", "accused", "purported", and so on relating to any "violations, and instead clearly indicate that one has already been convicted, and the gallows is being built with no opportunity for appeal. Required due process information about hearing rights, etc, aside, there is not even the most rudimentary of common courtesies extended - such as an offer to receive a customer's call and discuss the matter, with a phone number given. Such are the actions of an uncaring despot who feels the peasants are not entitled to anything other than receipt of the king's decrees.

When confronted with his failure to follow rudimentary due process procedures, or to follow the few, Spartan procedures of the HCSD that he had in place for customers during an "emergency", he simply made excuses about how the allegations against Plaintiff made it reasonable for him to do as he did, and how her property, and other rights, were not in play

Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 31

because each and every one of them was superseded somehow by the "rules and regulations",
and/or the "policies and procedures" of the HCSD (as he interprets them) - and yet he did so
while <u>also</u> repeatedly claiming *lack* of knowledge about those sections thereof which might be of
benefit to a customer accused of "violations" - and Plaintiff in particular.

Finally, despite the issuance of the Injunction in this case, multiple requests/notices to
Puckett and the HCSD directly concerning failure to provide proper water service (that is, usable
pressure and flow up to the gallonage allowed all other customers); a doctor's certification made
pursuant to California Law concerning Plaintiff's status as disabled person suffering from a
serious and debilitating medical condition; requests for a hearing concerning alleged
"violations"; and requests for information as to application/grant of reinstatement of Plaintiff's
full water supply functionality per the policies/practices/Rules/Bylaws of the HCSD - all since
August 4, 2021, the HCSD, Puckett, and Dingman failed to take **any** action to respond in a
rational, professional, concerned manner to those issues - or to even just issue a written response
- and they continue to do so. (ECF #67.) Instead they have simply hired lawyers and had those
lawyers start fighting this action.

By continuing to fail to provide Plaintiff even just the benefits of the long-established
Rules and other policies/procedures of the HCSD (which one would reasonably expect President
Puckett to be <u>very</u> familiar with by now after stating at the Hearing of September 2021 that he
lacked knowledge about potions thereof), the HCSD, Puckett, and Dingman continue to
lackadaisically deny Plaintiff the due process this Court found they had denied her when it issued
the Injunction (ECF #29, p.15).

There is simply no other way to qualify such behaviors and attitude <u>as anything other</u>
<u>than complete indifference towards, and (at the least) "reckless disregard" for, the Due Process,</u>
<u>statutory, and procedural rights of Plaintiff</u> (including those of the HCSD's Rules and Bylaws).
It is this complete disinterest in, and unwillingness to make any effort to address, the serious Due
Process deficiencies glaringly present at every stage of the HCSD's interactions with its
customers concerning water service - and as to Plaintiff in particular - that is the <u>true</u> basis for
this entire affair.  When a government agency, and its functionaries, do not follow the most basic
of norms concerning respectful conduct of their affairs with the public - such as <u>sending a letter</u>,
or looking up the number of a 16-year customer in the local phone book to give her a call about
any problems - then the dysfunction cannot be categorized as mere accident, or an isolated
incident.

This Court should find that based upon the evidence now before it, and the submissions of these Defendants, that the repeated violations of Plaintiff's civil rights, in ways large and small as alleged in this Motion, are the result of the "reckless indifference" to those rights by Defendant Puckett, and so this Court should grant Plaintiff summary Judgment as to that determination/issue, on <u>each</u> of her civil rights claims as stated herein.

## STATE LAW CLAIMS

### Count – I, Violations of HCSD Rules and Regulations by HCSD, Puckett, and Dingman

Defendants HCSD and Puckett claim that the notices of "violations" emailed to, and "taped to the fence/gate" of Plaintiff, were created, given, and enforced, pursuant to the Rules and Regulations of the HCSD, as well as its polices and procedures, and cited to the Rules and Regulations as part of the notices.  ECF #26, pp.2-3, and 16-22; #36, pp.14:14-21, 16:2-12, 19, 20:21-24).  He further presented evidence, and testified, that Resolution 2021-02 formed the basis for the actions taken against Plaintiff Olson in July of 2021.  (ECF #26, pp.2-3, and 12-15; ECF #36, pp.9:11-23, 18-19.)

Puckett further testified to the Court under oath at the TRO hearing that he was not required Rules to send Plaintiff any notices in the mail, and that, despite his <u>seven years</u> with the District and obvious familiarity with all ways in which violations can be alleged and punishment inflicted upon customers (and his actual involvement in doing so), he lacked any knowledge of if the Rules and Regulations required a certain amount of time between notice of violations and/or punishment being imposed.  (ECF #36, pp.18-20, 28:28 - 29:1, 30:11-14.)

When asked by the Court, and later again by Plaintiff about the steps involved with terminating Plaintiff's water service, Puckett described the process whereby he and Dingman removed Plaintiff's water meter and terminated her water service <u>without</u> any hearing being had at which Plaintiff might contest the "violations" alleged against her; <u>without</u> taking the interim step of installing a "flow restrictor" on Plaintiff's meter; and, <u>without</u> granting Plaintiff any period of time to undertake any corrections as to the alleged violations .  (ECF #29, p.15:18-28; #36, pp.19, 26:15 - 30:22; c.f., ECF #34, Rules and Regulations, Sections 2.10, 4.03.)

Despite Puckett's testimony to the contrary, the HCSD Rules and Regulations, at Section 4.03, *do* require that any <u>notice of a violation</u> be "served", and additionally that a customer be granted "not less than two...working days" in which to correct alleged violations[35].  Other sorts

---

[35] This period is even longer in the Bylaws (ECF #35) at Sections A-9(15), and 1-6.020, which specify <u>five</u> days to correct any "waste" of water.  The Defendants do not contend that their emergency

of notices, such as those pertaining to the HCSD's adoption of Resolution 2021-02 (ECF #26, pp.12-15), require that they be provided to a customer by "U.S. Mail" or "personal delivery" per Section 2.10.  Section 4.03 further, and more specifically, thus applies to Puckett's allegations of improper water use by Plaintiff (ECF #26, pp.2-3, and 17-25) via the provisions of the Rules at Section 4.15, and the Bylaws (ECF #35) at Sections A-9(15), and 1-6.020 (c.f. HCSD Resolution 2021-02 at ECF #26, pp.14-15, defining "Water waste"), and so any "notices" of alleged "violations" of waste of water **must** be <u>served</u>.  Since the HCSD is a subdivision of the State of California, and lies completely within its boundaries, it is obliged to conform its conduct to California law.  That means, in this instance, that the term "served" must be given the application and definition assigned to it by California's jurisprudence.  (Cal. Const., Art, XI, §7.)

Puckett's ECF #26 Declaration, and his testimony to this Court, makes clear that he never bothered to comply with those rules, that he further, and improperly (in the legal sense, as a matter of law), equates "personal service" and "personal delivery" of documents to Plaintiff with merely taping them to the fence or gate of Plaintiff's property, and that he <u>also</u> believes he did not have to comply with any HCSD Rules about service, mailing, or providing Plaintiff at least two days to correct any violations.  (ECF #36, pp.9:11-12, 26:15 - 27:23,  28:8 - 29:1, 30:11-14; c.f., HCSD Rules and Regulations ECF #34, Sections 2.10, and 4.03; HCSD Bylaws ECF #35, Sections A-9(15), and 1-6.020 [each granting five days concerning alleged "waste" of water].)

The truth is that to effect true "personal delivery" or "personal service" of documents in California, one must be within normal speaking distance from <u>a person</u>[36] - not standing at a gate or fence outside of the person's home, at the edge of the property while yelling at a house without any personal knowledge of it anyone is home or not (ECF #36, pp.9:11-12, 15:16-20, 26:15-21; 28:2-13, 29:2 - 30:10).  See *In Re: Ball*, 2 Cal.App.2d 578, 579 (1934) where the court found a requirement of <u>actual physical presence</u> for service upon a person of documents, but that that "[w]e take it that when men are within easy speaking distance of each other and facts occur that would convince a reasonable man that personal service of a legal document is being attempted, service cannot be avoided by denying service and moving away without consenting to take the document in hand."  Furthermore, "personal service" under California law means "personal

resolution, under which they acted to terminate Plaintiff's water service, alters any provisions of the Rules and Regulations, or the Bylaws.  Meanwhile, the documentation they submitted to the Court as ECF #26, pp.2:4-13, and 12-15, establishes conclusively that it did not.
[36] This also the Federal standard, which states even more clearly that service is accomplished by "handing it [the document to be served] to the person." (FRCP 5(2)(A).)

1    delivery of a copy of the summons and of the complaint <u>to the person to be served</u>" (California

2    Code of Civil Procedure ["CCP"] §415.10, emphasis added), while the HCSD's Rules at Section

3    2.10 provide similar specificity by requiring "personal delivery thereof <u>to the person to be</u>

4    <u>notified</u>" - neither of these provisions of law countenance delivery "to the fence of the person to

     be served", or "to the gate of the person to be served" instead of actually "to <u>the person</u>".

5         Furthermore, "service" of a document (HCSD Rules, Section 4.03) triggering, or giving

6    notice of, official action is only permitted in California in compliance with the applicable

7    provisions of CCP §§415.10 - 415.95.  Under <u>no</u> circumstances is taping documents to a

     perimeter fence or gate of a property considered "service" - particularly when no person over 18

8    is present to accept them, and when there is no follow-up sending of that document by US Mail

9    (certified or otherwise) occurs.  Indeed, any attempt of service <u>via **any** sort of posting</u>[37] generally

10   requires a court order, and Puckett's testimony and Declaration submitted at the TRO hearing

11   make clear he never sought any court orders for anything that he did, or instructed others to do.

12   (CCP §§415.45, 415.50, 1011(b); C.f., ECF #26, #36.)

          Finally, emailing notices or other documents to people as "service" or due notice thereof

13   is only permissible in California, and the Ninth Circuit, **if a party has given written permission**

14   <u>that it will accept such documents via those means</u>.  See FRCivP 5(b)(2)(E); CCP §§1010.6, and

15   1013. The HCSD's own written Rules and Regulations require notice of violations to be "served"

16   by (actual) personal delivery or USPS mail at Sections 2.10, 4.03, and 4.15.  Service by mail

17   under California law is accomplished as provided in CCP §1013(a).  As set forth in the Rules and

     Regulations (ECF #34) at Sections 2.10, 4.03, and 4.15, the HCSD's own adopted policies and

18   procedures thus <u>do not</u> allow for notice by email, nor gate/fence-taping, and these Defendants

19   ignored those restrictions and affirmative requirements in dealings with Plaintiff, while also

20   failing to comply with the affirmative requirements of mailing and/or true "personal delivery

     thereof to the person to be notified" (HCSD Rules, ECF #34, Section 2.10).

21        This Court, at ECF #29, pp.15:18 - 16:16, made findings of fact and law based upon

22   Puckett's Declaration and testimony as well, stating clearly that these Defendants failed to follow

23   their own Rules and Regulations, as well as the normal policies and procedures of the HCSD,

24   relating to the actions taken in termination of water service to Plaintiff.

25

     _____

     [37] Despite mentioning other persons occasionally being present in an around Plaintiff's property, Puckett
     does not claim at any point in his Declaration or testimony to this Court that he ever attempted to provide
     Plaintiff documents via substituted service upon someone over the age of 18 and found at her residence.

     Plaintiff's Motion for Partial Summary Judgment as to Defendants Puckett, HCSD, and Dingman - 35

Plaintiff has therefore established, as a matter of law, that Puckett, Dingman, and HCSD, in their interactions with Plaintiff's real and personal property, property and privacy interests, and also particularly the termination of her water service, did thereby recklessly violate, ignore, and/or refuse to follow the mandate of, multiple provisions of the HCSD Rules and Regulations and the benefits and rights granted to her thereby by failing to comply with <u>each</u> and <u>every</u> of the provisions of the Rules and Regulations of the HCSD at Sections 2.10, 4.03, and/or 4.15.  (ECF #36, pp.9:11-12, 26:15 - 27:25, 28:10-18;  HCSD Rules and Regulations, ECF #34, Sections 2.10, 4.03, 4.15.)

Plaintiff is thus entitled to a determination and judgment in her favor, and against these Defendants, on this claim as to these specific facts.

## State Law Count V - Violations of California Constitution Article 1, §7(a),  Article 1, §13, and Article 1, §19 by HCSD, Puckett, and Dingman

In making out this claim, Plaintiff incorporates, as if fully set forth at this point, the forgoing sections of this Motion, as set forth on pages 2 through 29, as well as the citations to the record of this Court, and to undisputed facts, found therein.  Plaintiff further incorporates, as if fully set forth at this point, the forgoing sections of this Motion, as set forth on pages 31-34.

Under both the United States and California Constitutions, a person is denied due process when a "governmental entity vested with broad administrative powers acts in an arbitrary manner so as to affect capriciously the property or property rights of persons subjected to its administrative controls." (*Walsh v. Kirby* (1974) 13 Cal. 3d 95, 105-106; see also U. S. Const., 14th Amend., §1; Cal. Const., Art. I, §7, subd. (a).)  Under the circumstances of the undisputed facts discussed in the foregoing sections, Defendants' search and/or seizure of Plaintiff's water meter, water service, water piping to her home, and driveway (by summarily trespassing onto the curtilage of Plaintiff's home, and summarily towing vehicles belonging to her overnight guests and contractors therefrom without any warrant[38]), all without any notice <u>containing information</u>

---

[38] The Fourth Amendment requires that, absent consent or exigent circumstances, government officials must have a valid warrant, supported by probable cause to believe that the search will uncover evidence of a crime, to enter a person's home. *Jones v. United States*, 357 U.S. 493, 497-98 (1958); see *Groh v. Ramirez*, 540 U.S. 551, 558-59 (2004). Article I §13 of the California Constitution, which creates an even "more exacting standard" for protecting privacy than does the Fourth Amendment, requires no less. See *People v. Cook*, 41 Cal.3d 373, 379 (1985) (emphasizing the "particular zeal" with which California guards the individual's privacy within his home or office and the "high privacy interest in the 'curtilage' of a residence"); *People v. Ruggles*, 39 Cal.3d 1, 11 (1985).

concerning a "hearing", and without any notice containing information about any **opportunity to request a hearing** to contest the "violations" alleged against Plaintiff which purportedly led to the actions of the HCSD, Puckett, and Dingman,, and **without any hearing** <u>actually being had</u> regarding those "violations" alleged in the "notices" <u>prior</u> to those actions being taken (and at any later point in time as well), meet this test multiple times over.

Also, and applicable in this case to the seizure and conversion without compensation of Plaintiff's water meter by these Defendants, in a manner similar to the <u>Fifth Amendment</u> of the federal constitution, Article 1, §19 of the California constitution provides that: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

Based upon the record now before this Court, it is indisputable that by engaging in the conduct that is described in the FAC (ECF #44), and which is the subject of this Motion, the HCSD, Puckett, and Dingman, also thereby violated the foregoing sections of the California Constitution. And the Court should enter judgment in Plaintiff's favor, and against these Defendants, on this claim, as to these sections of the California Constitution.

Respectfully submitted this 17th day of February, 2022.

_Kimberly R. Olson_
Kimberly R. Olson, Plaintiff Pro Se

## CERTIFICATION AND PROOF OF SERVICE

I, Kimberly R. Olson affirm under penalty of perjury under the laws of the United States that I served the HCSD Defendants a true copy of the foregoing document via US Mail to their counsel of record, at the address(es) below, on December 17, 2021 as follows:

Jeffrey Chiao
601 University Ave., Ste. 225
Sacramento, CA 95825

Dated this 17th day of February, 2022.

_Kimberly R. Olson_
Kimberly R. Olson, Plaintiff Pro Se

1  Kimberly R. Olson
   PO Box 243, Hornbrook, CA 96044
2  kimberlyrenee@yahoo.com (email not for service)
   (530) 475-3669
3

4

5

6                    THE UNITED STATES DISTRICT COURT

7           IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

8  Kimberly R. Olson,                    )
                                         )  Case No: 2:21-cv-1482 KJM DMC (PS)
9             Plaintiff,                  )
                                         )  STATEMENT OF UNDISPUTED FACTS IN
10  vs.                                  )  SUPPORT OF PLAINTIFF'S MOTION FOR
                                         )  PARTIAL SUMMARY JUDGMENT
11  Robert Puckett, Sr., et al,          )
              Defendants,                )  Date: March 23, 2022
12                                       )  Time: 10:00 a.m.
                                            Place: Redding Courthouse
13  _____    Judge: Hon. Dennis M. Cota

14         Plaintiff Kimberly R. Olson ("Plaintiff" or "Olson"), does hereby submit these

15  Undisputed facts as to Plaintiff's claims arising under 42 U.S.C. §1983 for violations of various

16  of her rights under the US Constitution, and those of her State Law claims which are the subject

17  of this Motion for Summary Judgment ("Motion" hereinafter) rely on some common facts, all of

    which are undisputed by the parties. Those are:

18         1) The HCSD is an entity of local government, operating as a political subdivision of the

19  State of California, and a Special District subject to the provisions of Government Code Section

20  61000 *et seq*, that provides water to the community of Hornbrook, California, and to Plaintiff's

    home (ECF #4, p.1:16-18; #44, p.2.)
21
           2) The HCSD maintains a copy of its currently-effective Rules and Regulations which
22
    govern its operations, as an enactment of a government entity, and a public record, on its
23
    website, located at : https://hornbrookcsd.specialdistrict.org/operation-policies   A true copy of
24
    those Rules and Regulations was Lodged with this Court as ECF #34.

25         3) Defendants Puckett and Dingman are officers and employees of the HCSD (ECF #17-

    1, p.1; #17-5, p.1; #36, pp.18:2-7; #41, p.2:19-22.)

           4) At some point, on or about July 20-23, 2021, Plaintiff's water service to her home was

    terminated by the direct actions of the HCSD, Puckett, and Dingman - culminating in the

           Statement of Undisputed Facts for Plaintiff's Motion for Partial Summary Judgment - 1

removal of Plaintiff's water meter. (ECF #4, p.2:5-8; #26, p.3:15-21; #29, pp.11:18-22; #36, pp.19:1-24; #41, pp.2:20 - 3:11; #44, pp.2-3.)

5) All of the "notices" concerning alleged "violations" by Plaintiff Olson that are the subject of this action were created by the HCSD and its President, Defendant Puckett, and were only transmitted to Plaintiff by means of email and/or by taping them to the fence (or gate) surrounding Plaintiff's home and property. Further, at no time prior to the removal of Plaintiff's water meter, and termination of the water service to Plaintiff's residence, did the HCSD or Puckett attempt to provide any of those "notices", or information about their contents, to Plaintiff Olson via the US Post Office, or by telephone. (ECF #26, p.3:22-25, and pp.16-25; #36, pp.9:11-12, 26:15 - 27:25, 28:10-18.)

6) Two of the "notices" created and sent to Plaintiff Olson by the HCSD and its President, Defendant Puckett, stated that Plaintiff was accused of criminal conduct, and that certain actions would be taken against her on that basis. (ECF #26, pp.2:21-23, 22, and 25.)

7) None of the "notices" purportedly provided to Plaintiff by the HCSD and Defendant Puckett contain any notice of the date and time of any impending "hearing", nor do any of the notices contain any direction as to how Plaintiff might *request* a hearing, to contest the allegations of any "notice". The notices also do not provide the name of any employee of the HCSD. (ECF #26, pp.16-25.)

8) At no time prior to the termination of her water service by the HCSD, Puckett, and Dingman, was Plaintiff ever given any hearing(s) by the HCSD and/or Puckett at which she had opportunity to put on evidence and otherwise contest the allegations of "violation(s)" set forth in the "notices" generated by the HCSD and Defendant Puckett. (ECF #26, pp.16-25; ECF #36.)

9) The normal policy and practice of the HCSD is to read the water meters of customers once each month, and to do so at or near the same day each month. (HCSD Rules and Regulations, ECF #34, Section 12.07.)

10) During the period of July 16, 2021, through July 23, 2021, no written notice was provided to any of the customers of the HCSD (including Plaintiff) that water meters would be read at any time other than the normal meter reading period (the 25th through the 30th of each month), and/or read in a manner contrary to HCSD Rules and Regulations, Section 12.07. (ECF #4, #26, #36, #41, #44.)

11) The HCSD does not hold any easements to any portion of Plaintiff's real property in Hornbrook, CA for any purpose. (ECF #4, p.2:20-22; #44.)

12)  The Findings and Recommendations issued by the Hon. Dennis M. Cota on 09/17/2021 as ECF #29 were adopted in full by the Hon. Kimberly J. Mueller, Chief Judge, on 12/06/2021 as ECF #52.

13)  To any extent that they conflict with the provisions of the Constitution and laws of the State of California, any of the HCSD's, and/or Puckett's policies, procedures, customs, practices, and/or Rules and Regulations, are preempted by state laws and therefore violate Article XI § 7 of the California Constitution.  "Under article XI, section 7 of the California Constitution, 'a county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general state laws.' If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void. A conflict exists if the local legislation (1) duplicates, (2) contradicts, or (3) enters an area fully occupied by general law, either expressly or by legislative implication." *O'Connell v. City of Stockton*, 41 Cal.4th 1061, 1067 (2007) (citations and internal punctuation omitted, numbering added).

14)  Plaintiff's water service, was during the period of the month of July 2021, and is, a Constitutionally-protected property interest; that the HCSD is prohibited from terminating that water service "at will"; and, that Due Process considerations attach to the actions of the HCSD, Puckett, and Dingman relating to: the provision of, interference with, notices concerning, and/or termination of, Plaintiff's water service to her home.  (ECF #29, pp.14-16:15[1].)

15)  Plaintiff's water service, was during the period of the month of July 2021, and is, a Constitutionally-protected property interest, and the HCSD is required, as a matter of law, to abide by its own Rules and Regulations, policies, practices, customs, Resolutions, and Bylaws in administering and delivering Plaintiff's water service to her.

16)  There are no provisions in the Rules and Regulations of the HCSD that permit the towing of otherwise lawfully-parked vehicles located over a customer's water meter.

17)  There are no provisions in the Rules and Regulations of the HCSD that permit the towing of otherwise lawfully-parked vehicles without a warrant.

---

[1] The Court's analysis did not, however, contain any examination of the Constitutional sufficiency of the content of the notices purportedly provided to Plaintiff by the HCSD and Puckett, nor did it consider the Constitutional ramifications of **the complete absence of opportunity for a hearing** for Plaintiff (prior to any termination of water service) to meet and contest the accusations and evidence against her of "violations" and other material as was contained in the notices.

Statement of Undisputed Facts for Plaintiff's Motion for Partial Summary Judgment - 3

18)  There are no provisions in the Rules and Regulations of the HCSD providing that any notices given to customers of an alleged "violation" contain information on how to request a hearing to contest any "violation".

19)  There are no provisions in the Rules and Regulations of the HCSD providing that any notices given to customers of an alleged "violation" contain information as to the name and phone number of an HCSD employee that the customer may call to discuss the notice, and/or any "violation", or to whom they can speak with directly to obtain information on contesting any "violation".

Respectfully submitted this ⎽⎽17th⎽⎽ day of February, 2022. *Kimberly R Olson*

Kimberly R. Olson, Plaintiff Pro Se

## CERTIFICATION AND PROOF OF SERVICE

I, Kimberly R. Olson affirm under penalty of perjury under the laws of the United States that I served the appearing Defendants a true copy of the foregoing document via US Mail to their counsel of record, at the address(es) below, on February ⎽⎽17⎽⎽, 2022 as follows:

Jeffrey Chiao
601 University Ave., Ste. 225
Sacramento, CA 95825

Dated this ⎽⎽17th⎽⎽ day of February, 2022.

*Kimberly R Olson*

Kimberly R. Olson, Plaintiff Pro Se